757 A.2d 108

**BERRY & GOULD, P.A. and Jed D. Gould**

v.

**F. Norman BERRY.**

**No. 125, Sept. Term, 1999.**

Court of Appeals of Maryland.

July 28, 2000.

Reconsideration Denied Sept. 6, 2000.

**144**

Philip B. Zipin (Gagliardo & Zipin, on brief), Silver Spring, for petitioners.

Joseph M. Mott, Rockville, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

RODOWSKY, Judge.

We granted certiorari in this case to determine if the plaintiff enjoyed a substantive right for which a restitutionary remedy would lie. Due to disability, the plaintiff was required to withdraw from the practice of obstetrics and, accordingly, as a shareholder in his professional services corporation. At issue is whether the corporation and its remaining shareholder were obliged to pay to the plaintiff the value of his share of the goodwill enjoyed by the practice, when there was no express promise to do so. The material facts relevant to this issue are undisputed and present a question of law. We shall hold that the corporation and the remaining shareholder have not been unjustly enriched and have no obligation to pay the plaintiff, as restitution, the value of his goodwill.

The instant action was brought in the Circuit Court for Montgomery County by the respondent, F. Norman Berry, M.D. (Berry), against the petitioners, Jed D. Gould, M.D. (Gould) and Berry & Gould, P.A., a professional services corporation (the P.A.). The P.A. was incorporated in 1970 with Berry as one of the original shareholders. Over the years shareholders came and went, but, for purposes of the

issues in the instant matter, we may consider that Berry and Gould were fifty percent shareholders at all relevant times.

By 1987 Gould had become a shareholder and, that year, the shareholders in the P.A. entered into a corporate stock agreement (the Agreement). Under ¶ A.1 of the Agreement the P.A. was obligated to redeem a shareholder's stock upon certain events, including:

"f. If any Stockholder voluntarily terminates his or her employment with the Corporation.

"g. If any Stockholder becomes 'disabled' for more than eighteen (18) months as hereinafter set forth in Paragraph A.5 below."

The purchase price for redeemed stock was its book value, determined on an accrual basis of accounting and as of the last day of the month in which the redemption took place. Book value was to be determined by the then CPA for the P.A., whose determination would be binding on all parties.

Under the disability provisions of the Agreement, the P.A. paid full compensation each month to a disabled shareholder for a period of three consecutive months from the first day of the month following the month in which the disability commenced. Thereafter, for the next twelve months, the P.A. paid to that disabled shareholder the difference, if any, between two-thirds of the disabled shareholder's annual compensation and the amount paid under a disability policy carried by the P.A. If the disability continued for eighteen months the disabled shareholder agreed to sell and the P.A. agreed to redeem the stock of the disabled shareholder within ninety days of the end of the eighteen month period.

Each shareholder of the P.A. also agreed to "devote his or her full time, knowledge, skill and attention to the professional practice of the [P.A.], to the exclusion of any other competitive business and/or professional activities."

Beginning in the fall of 1994 Berry developed arthritic pain in his right elbow which became progressively worse. On one occasion, in the course of a difficult forceps delivery, he dropped the forceps. He was unable to button his shirt or to

put on a scrub hat. Gould, an employee obstetrician of the P.A., Dr. Gregory C. Tyler (Tyler), or an obstetrician from outside the P.A. had to be available to back up Berry for difficult deliveries. Berry continued to see patients but had to examine them left-handedly. By March 1995 Berry was unable to eat with his right arm. In a memorandum to Gould dated March 8, 1995, Berry advised, "As of March 15, 1995, I will be leaving on disability." The memorandum contained some twenty proposals as to how the transition should be effected and contemplated that Tyler would buy Berry's shares in the P.A. Berry also sought payment for goodwill, saying:

"I will be the very first partner ever leaving the practice and not taking his or her patients with them. Dr. Piver was bought out and took his practice with him, Dr. Ladd was bought out for $180,000 and took her patients with her, Dr. Mazer was bought out and he still maintains his practice, and Dr. Tran was bought out and took her patients with her. I will be leaving over 25 years of good will and practice patients that have real value. I think this is essential to the viability of the continuation of the practice. It has definite worth of approximately $75,000. I will personally correspond or talk to all the patients and urge them to continue care in our offices with the two remaining associates. If this cannot be agreed upon, then I will find a practice to make arrangements for my patients to be bought by them and then I will make full faith efforts to see [that my] patients go to them.

"The $75,000 for good will and patients to be left in the practice would be $75,000 to be divided equally, $37,500 by Dr. Gould and Dr. Tyler."

A few days later, on March 12, Berry and Gould met at Berry's request to discuss Berry's departure. They reviewed the March 8 memorandum point by point. Thereafter, Berry drafted a memorandum dated March 19, 1995, in which Berry memorialized the March 12 discussion. In part the memorandum reads:

"That Dr. Berry will be the first and only partner who has ever left the practice and not taken his or her patients/goodwill (26 years) with him or her. That these patients/goodwill are a valued asset and that Dr. Berry will negotiate with Drs. Gould and Tyler to purchase of same. That it makes excellent business sense and is extremely important that these patients and goodwill remain with the practice to ensure continuity and long-term success of the practice. If this option to purchase Dr. Berry's patients/goodwill is not agreed upon, then Dr. Berry will take his patients/goodwill and negotiate for their purchase with other physicians."

Berry scheduled another meeting with Gould at which Berry asked Gould to sign this "Memorandum of Understanding." Gould refused to sign and indicated instead that he wished to have his attorney review the memoranda and the Agreement.

In a letter to Gould, dated April 25, 1995, Gould's attorney, after describing the payments that the Agreement required the P.A. to make "if a stockholder becomes disabled," opined that

"[i]t is absolutely clear that all patients belong to the corporation, subject only to the desires of the patient. This was obviously made a part of the agreement so that the corporation would be able to make continued salary payments to the *disabled* person."

(Emphasis added).

The letter from counsel further stated as follows:

"Furthermore, the corporation will thereafter acquire the stock of the *disabled* stockholder.... At this point, the corporation becomes the owner of all of the assets.... This, of course, includes 'goodwill' and it is difficult to see how, under this agreement, or any similar agreement that does not make a specific provision for the same, that [Berry] can claim that he is entitled to any additional payment for turning over patients to the corporation. Again, these patients are an asset of the corporation and belong to the corporation....

"Any *disabled* stockholder who, in any way, interferes with the corporation's rights to the patients is guilty of a breach of contract which will cause severe financial loss to the corporation. Any attempt ... to contact patients in a manner that would encourage them to leave the practice would be in violation of the agreement. This damage involves not only the loss of the fee for a particular professional service but also loss of future anticipated fees. In my opinion, this would involve the loss of thousands of dollars per patient and the corporation could bring an immediate suit for the total anticipated loss.

"From the foregoing you can see that it is my opinion that this is a typical buy-sell agreement whereby the corporation acquires all of the assets of a *disabled* stockholder in the corporation. The three months of salary, disability payments and book value of the corporation include any goodwill factor and the terminating stockholder has no rights thereafter in any corporation asset."

(Emphasis added).

Gould gave Berry a copy of this letter. Berry then obtained counsel. On June 15, 1995, Berry advised Gould and the P.A. that Berry was not electing a disability retirement; rather, he took the position that he was voluntarily retiring from the P.A., thereby triggering the P.A.'s obligation to redeem Berry's stock as of June 30, 1995.[1] In response, Gould took the position that Berry, once having elected a disability retirement, could not thereafter elect a voluntary retirement.

Tyler never purchased Berry's stock, and Tyler left the practice in December 1995. Through counsel, the parties continued to negotiate for some time. Berry never attempted to market his patient list to some other obstetrical practice. Berry testified that he thought it was best for all concerned that he continue to negotiate with Gould and Tyler to have his patients, with his help, stay with their practice. Secondly,

---

**1.** In December 1995 Berry wrote a letter to his former patients, but that letter is not in evidence and its content is not described in the evidence.

Berry said, "I was under a threat of litigation and if I would go out and try and make an arrangement with anyone else, I'd have to morally and honestly tell them that there is a potential litigation out there, and I felt that very few people would want to be involved in any litigation." Thirdly, Berry said that he and his attorney believed that there would be some area of agreement with Gould. No agreement, however, was ever reached. Gould and the P.A. paid nothing to Berry, who in March 1996 instituted the action that is before us. It was tried non-jury.

From Berry's multi-count complaint those counts seeking a declaratory judgment and a recovery for unjust enrichment are pertinent to our review. Preliminarily, the circuit court ruled under the declaratory judgment count that the Agreement did not make Berry's election of disability retirement irrevocable and that Berry could voluntarily terminate his employment with the P.A., even though Berry was disabled. This ruling is not challenged in this Court. The circuit court also ruled that the Agreement did not impose an obligation on the P.A. to pay for goodwill, a ruling that, likewise, is not challenged in this Court. The circuit court, however, deferred for trial whether Berry could recover for goodwill, absent any express provision for payment in the Agreement.

After trial the circuit court netted out a number of debits against and credits to the defendants resulting in judgment in favor of Berry against Gould and the P.A. for $101,700. Included within the judgment were awards of $50,000 for the book value of the P.A. stock, $19,600 for unpaid management fees to Berry, and $12,500, representing the principal amount of a loan made by Berry to the P.A. that remained unpaid. These items, totaling $82,100, were made subject to prejudgment interest running from June 30, 1995. Credits to the defendants included $17,000 in fees paid by the P.A. to an obstetrician from another practice who helped cover for Berry during the latter's pre-termination disability.

The $101,700 judgment in favor of Berry also included $37,500 for goodwill. That portion of the judgment is the only

issue in the matter before us. The circuit court found that goodwill was, in fact, an asset of the practice. The court further found that in the negotiations "Gould's question was not so much whether he had to pay for [goodwill]"; rather, "Gould thought that there was goodwill, and it was just a question that he did not think it should be that much," referring to Berry's valuation of $75,000 for his half of the goodwill for which Berry had proposed that Gould and Tyler each pay $37,500. The circuit court said that Gould had asked for the letter from counsel because Gould was "having trouble over this whole thing" and that Gould "did not disavow that he was going to sue if [Berry] did something different." The value of the total goodwill was found to be one-half of what Berry's initial demand had been, and the court's award of $37,500 to Berry represented fifty percent of goodwill of the practice which the court valued at $75,000. In this Court the sole basis advanced by Berry to sustain the $37,500 award for goodwill is that the petitioners were unjustly enriched.

The petitioners appealed to the Court of Special Appeals which, in an unreported opinion, affirmed. On the issue before us the Court of Special Appeals stated that the trial judge, "as the trier of fact, was in the best position to evaluate the totality of the evidence on the subject of goodwill and to determine whether the parties intended for goodwill to be a marketable asset."

We granted the petition for certiorari filed by Gould and the P.A. Reflecting Berry's exclusive reliance on unjust enrichment to support the judgment, the petitioners present the following questions:

1. Did the Agreement, which provided that a withdrawing shareholder was to receive only the "book value" for stock, preclude Berry from recovering for goodwill? and

2. Even if not precluded by the express language of the Agreement, was Berry properly awarded compensation for goodwill under the theory of *quantum meruit*/unjust enrichment?

Because we shall answer the second question "no," and find that Berry cannot recover for goodwill under a theory of unjust enrichment, we need not address the first question of whether the Agreement itself would otherwise preclude recovery for goodwill.

In this Court Berry contends that the threat of suit contained in the letter of April 25, 1995, written to Gould by his attorney, was wrongful conduct on the part of the petitioners which prevented Berry's sale of his goodwill and that, by this wrongful conduct, the P.A. and Gould are unjustly enriched to the extent of the value of Berry's goodwill. In opposition, the petitioners argue that the residual benefit to the P.A. and to Gould of the goodwill from Berry's practice was incidental to Berry's having participated in practice through the P.A. for many years, for which Berry was paid, so that there is no unjust enrichment.

I

Restatement (Second) of Restitution § 1 (Tentative Draft No. 1, 1983) (Tent. Restatement) states the general principle of unjust enrichment to be:

"A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment."

*Id.* at 8–9.

■■■ This Court has defined unjust enrichment as constituting three elements:

" '1. A benefit conferred upon the defendant by the plaintiff;

" '2. An appreciation or knowledge by the defendant of the benefit; and

" '3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.' "

*County Comm'rs v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 95 n. 7, 747 A.2d 600, 607 n. 7 (2000) (quoting *Everhart v. Miles,* 47 Md.App. 131, 136, 422 A.2d 28, 31 (1980)).

As one commentator has said:

"The concept of unjust enrichment is notoriously difficult to define. It has on occasion been regarded as too indefinite and vague to be recognized as a general legal principle, with concern expressed that its adoption might undermine legal stability, confuse legal thinking, and jeopardize clear, systematic organization of the law."

D. Friedmann, *Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong,* 80 Colum. L.Rev. 504, 504–05 (1980).

The Tent. Restatement, recognizing that "[t]he situations that generate rights to restitution cannot be enumerated exhaustively," identifies three characteristic circumstances. *Id.* § 1 cmt. *c,* at 10. These are "(i) a voluntary transaction between the parties, not fully effective; (ii) wrongdoing directed against an interest of the claimant; and (iii) mistake." *Id.* The work cautions, however, that "[i]n other situations restitution is required although none of these elements is present." *Id.* at 10–11.

Here, the tort that bears some resemblance to Berry's theory of wrongdoing is "maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663, 674 (1984). The elements of the tort are

"(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

*Id.* at 71, 485 A.2d at 675 (internal quotations and attribution omitted). "[W]rongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the

plaintiff's business relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.,* 336 Md. 635, 657, 650 A.2d 260, 271 (1994). *See also Macklin v. Robert Logan Assocs.,* 334 Md. 287, 307–08, 639 A.2d 112, 122 (1994).

To illustrate the types of wrongful or unlawful acts that could form the basis for malicious interference with economic relations, this Court has quoted W. Prosser, *Law of Torts* § 130, at 952–53 (4th ed.1971), which refers to "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Alexander,* 336 Md. at 657, 650 A.2d at 271; *K & K Management, Inc. v. Lee,* 316 Md. 137, 166, 557 A.2d 965, 979 (1989).

■ Here, the economic relationship with which Berry contends that the petitioners interfered is that between Berry and some undetermined purchaser of Berry's patient list. We shall assume, *arguendo,* the existence of a class of obstetricians who likely would be interested in purchasing a list of Berry's patients and that the existence of such a class is sufficient proof of a probable buyer to satisfy the actual loss element of the tort. *Cf. Volvo North Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 74–75 (2d Cir.1988) (allegations, *inter alia,* that defendants used monopoly power over men's professional tennis to threaten punitive action against tournament producers if they permitted banners bearing plaintiff's tennis logo held sufficient, without allegation that any particular contract was lost due to defendants' activities.).

Here, there is no evidence that the petitioners had any contact with any prospective purchaser. The act which Berry alleges constitutes the interference is the threat of suit contained in the attorney's April 25, 1995 letter. That threat was not groundless.[2] The letter was directed solely to the state of facts then existing. It was written after Berry had elected disability retirement and before Berry undertook to change

---

2. Berry was represented by counsel who presumably could advise Berry that he was free to sell his practice to a third party, if counsel viewed the threat as groundless.

his election to a voluntary withdrawal. The letter clearly addresses only disability retirement. In the opinion of counsel the P.A. acquired as its asset any individual goodwill that Berry owned in consideration of the P.A.'s obligation to pay Berry full salary for three months, disability retirement for twelve months, and to pay book value for his stock not earlier than eighteen months nor more than twenty-one months after the inception of disability status. This is not an unreasonable interpretation of the Agreement.

Viewing the Agreement as a whole, counsel's interpretation contrasts disability retirement with voluntary withdrawal. In the latter event, precedent within the P.A. recognized a construction of the Agreement whereby voluntarily withdrawing shareholders could take their practices with them, and they would be paid only for their shares at book value. The shareholder retiring on disability, however, received a stream of payments from the P.A., and it is reasonable to imply a promise on the part of the disabled shareholder to leave his practice with the P.A. in consideration of receiving that stream of payments while inactive. Indeed, inasmuch as the disabled shareholder remained a shareholder until the corporation redeemed the shares after the disability payments had ceased, the express provision of the Agreement proscribing competitive activity by any shareholder seemingly would prevent a disabled shareholder from selling his or her practice to another practice.

At some point after June 15, 1995, when Berry had elected voluntarily to withdraw from the P.A., the petitioners took the position that his earlier election of disability retirement fixed the liability of the P.A. under the Agreement. Although the circuit court concluded that the Agreement did not prevent a change of that earlier election, and although that ruling is not challenged on this certiorari review, it does not follow that the petitioners' assertion that Berry could not change his election constituted unlawful means for purposes of the interference tort. Petitioners' position was not groundless. Under the election of disability retirement Berry could not require the P.A. to redeem Berry's stock until at least eighteen months

had passed from the commencement of the disability. A construction of the Agreement under which Berry was permitted to change the election unilaterally increased the P.A.'s liability by accelerating the time for payment of the redemption price. It is unusual for contracts to be construed as permitting one party unilaterally to increase the other party's liability.[3]

■ Based upon the circuit court's construction of the Agreement, the P.A.'s refusal to recognize Berry's change of election breached the Agreement in that the P.A. did not redeem based on the June 30, 1995 valuation of Berry's stock. Berry has been compensated for this breach by the award of damages on a breach of contract count in the complaint. Pertinent to this case is the rule that breach of a contract between the plaintiff and the defendant is not a basis for the interference tort, if the interference is simply incidental to the breach. *See K & K Management, Inc.,* 316 Md. at 159–65, 557 A.2d at 976–79 (lessor's breach of lease of restaurant not tortious interference with lessee's relations with restaurant customers and suppliers). Here, the petitioners, by maintaining their position that the P.A. had acquired Berry's patient list under the disability retirement provisions of the Agreement, only incidentally affected the relationship between Berry and a potential purchaser. Berry was faced with an adverse claim of title that was not groundless. Acting with the advice of counsel, Berry chose to negotiate, ultimately unsuccessfully, with the petitioners rather than to attempt to sell his patient practice to some other obstetrical practice, as he had threatened to do, and to take his chances on litigating with petitioners his right to sell.

Berry has cited this Court to Maryland Code (1975, 1993 Repl.Vol., 1999 Cum.Supp.), § 5–119 of the Corporations and Associations Article which reads:

---

**3.** The petitioners assert in their brief that Berry was paid full salary under the disability provisions of the Agreement for the ninety days from March 15 to June 15, 1995, but they give no reference to the record to support that assertion.

"(a) *Individual employee.*—The relationship between an individual rendering professional services as an employee of a domestic or foreign professional corporation and the client or patient of the individual is the same as if the individual were rendering the services as a sole practitioner.

"(b) *Corporation.*—The relationship between a domestic or foreign professional corporation and the client or patient for whom an employee of the corporation is rendering professional services is the same as that between the client or patient and the employee."

Berry contends that the policy of this statute requires that Berry's goodwill from his practice be owned by him and that it could not have been owned by the P.A. Although Berry utilizes this statute primarily to answer an argument advanced by the petitioners under question one, which we are not considering, the statute does have some relevance to question two.

There is complete accord between the parties that the patients are free to see the obstetrician of their choice, and, in that sense, no one owns the practice. It is also agreed between the parties that Berry was free to take his practice with him if he voluntarily withdrew from the P.A. to practice elsewhere, but it is apparent that his physical limitations made that alternative impossible. It is unnecessary for us to decide the respective interests, if any, that Berry and the P.A. had in goodwill associated with Berry's patients during his years of active practice with the P.A. The point made in the letter from Gould's counsel is that, by electing disability retirement, Berry sold his goodwill to the P.A. for the added consideration promised to a disabled shareholder and that, at that time, the goodwill became an asset of the P.A.

Inasmuch as the plaintiffs did not tortiously interfere with a prospective sale by Berry of his goodwill, the petitioners did not continue, after Berry's retirement, to benefit from Berry's residual goodwill by wrongful means. Accordingly, the petitioners are not liable to Berry for unjust enrichment on that ground.

## II

■ Although restitution is not limited to situations in which the defendant has acquired a benefit by wrongful means, conferral of a benefit and a right to restitution are far from equivalent concepts. Perhaps the most common illustration of receipt of a benefit without restitution liability is found in building construction contracting. The subcontractor who furnished labor and materials which have been incorporated into the building and which benefit the owner has no claim for restitution from the owner in the event that the subcontractor is not paid by the general contractor. *See Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland*, 342 Md. 169, 674 A.2d 534 (1996). Included among the reasons for this result are that " 'the parties almost certainly contemplated that their contractual arrangements constituted the full set of liabilities.' " *Id.* at 184, 674 A.2d at 541 (quoting 1 D. Dobbs, *Law of Remedies* § 4.9(4), at 698 (2d ed.1993)). Specifically, the subcontractor has relied upon the credit of the general contractor (mechanics' liens aside) and not on the credit of the owner, and the owner has bargained for a fixed liability, the price agreed to be paid to the general contractor. *See also Goldberg v. Ford*, 188 Md. 658, 53 A.2d 665 (1947) (plaintiff, who by contract with lessee of strip mine expended $18,000 in uncovering 8,000 tons of coal, not entitled to restitution from lessor who benefitted from the work upon reentry after default by lessee).

■ In the instant matter Berry acquired his patients while practicing within the P.A. which paid Berry an agreed consideration for practicing through it, but there was no agreement that the P.A. would purchase Berry's goodwill if Berry voluntarily withdrew from the P.A. The fact that, at Berry's retirement, there was a pool of patients who would have confidence in his recommendation concerning a successor obstetrician and who, absent any recommendation by Berry to the contrary, would likely continue to seek the professional services of the P.A., is an incidental consequence of Berry's having practiced for his own benefit with the P.A. Ordinarily

restitution is not available for a benefit conferred as an incident of a plaintiff's having acted primarily for his or her own benefit.

Relevant to the facts here is *Ulmer v. Farnsworth,* 80 Me. 500, 15 A. 65 (1888). There the plaintiff and the defendant owned interconnected quarries. When the plaintiff drained his quarry, the defendant's quarry was necessarily drained as well. The plaintiff's claim for restitution was denied. Dobbs explains the result on the following basis:

> "Although [the plaintiff's] *purpose* was not to benefit the defendant, the benefit was nonetheless intentionally conferred in the sense that the plaintiff knew with certainty that it would result. Nothing in the nature of the circumstances prevented bargaining: the parties knew each other and knew the interests involved; parties were not so numerous that bargaining was infeasible. Where the benefit is intentionally conferred, is not in cash or specific chattels, and the parties are in a position to bargain about compensation, the cases, in line with *Ulmer v. Farnsworth,* deny restitution."

1 D. Dobbs, *Law of Remedies* § 4.9(4), at 693 (2d ed. 1993) (Dobbs) (footnote omitted).

The fact that the benefit to the petitioners, initially acquired incidentally to Berry's pursuing his own self-interest, remains with the petitioners after Berry's retirement, does not give rise to a restitutionary obligation on the petitioners. In the case of real estate the concept is presented in the following illustration from Tent. Restatement:

> "Upon the death of his wife, B moves into the home of S, his sister. With her consent B pays for finishing unused attic space, adding to the comfort of the entire household and enhancing the value of S's house. After a year B finds quarters elsewhere. S does not owe restitution to B."

*Id.* § 2, cmt. *d,* illustration 10, at 42.

More analogous to the case before us is *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 49 F.Supp.2d 298 (S.D.N.Y.1999). In that case the defendant had been the exclusive United States distributor for the plaintiff manufacturer's line of furni-

ture, but the plaintiff had terminated that relationship. The defendant was left with a stock of furniture of the plaintiff's manufacturer which the defendant continued to promote for sale through various forms of advertising. When the plaintiff sued the defendant for trademark infringement, the defendant counterclaimed for unjust enrichment, contending that its promotion of plaintiff's product, as well as handling complaints about defective merchandise and unfilled orders, enhanced the plaintiff's goodwill. *Id.* at 304. The court granted the plaintiff summary judgment on the counterclaim. Although an issue of fact for trial was presented on whether the manufacturer was enriched, the court held as a matter of law that the enrichment was not unjust. The defendant "continued to support the mark because it continued to sell the furniture and because it wished to ensure that its customers would continue to purchase furniture at its stores. Any benefit to [the plaintiff] was a by-product." *Id.* at 305.

Similar to *Gidatex* is *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157 (S.D.N.Y.1998). The plaintiff in that case was the former distributor for Scandinavia of Calvin Klein jeans. It terminated that relationship with the defendants when the plaintiff believed that the latter were selling Calvin Klein jeans to discount stores, thereby undercutting the prestigious market that the plaintiff allegedly had created. *Id.* at 161. In the litigation that followed one of the plaintiff's claims was for unjust enrichment, seeking the profits that the defendants had realized allegedly based on six years of effort expended by the plaintiff in promoting the product in Scandinavia. In granting summary judgment for the defendants on this claim the court said:

"[The plaintiff] performed for its own benefit and perhaps for the benefit of its customers and [the defendants]. Defendant's actions in tapping into the demand created by [the plaintiff] therefore cannot give rise to a claim for quasi-contractual relief."

*Id.* at 167 (footnote omitted).

The commentators on restitution have identified certain themes that help to explain cases in which a benefit has been

received but in which no restitution is ordered. Dobbs speaks of the defendant's "autonomy interests" so that "rights fixed by a contract between the parties must not be altered by an award of restitution." 1 Dobbs § 4.1(2), at 563. Palmer states that "the promotion of self-interest will rarely justify restitution which has the effect of imposing a new money obligation on the recipient of the benefit." 2 G. Palmer, *The Law of Restitution* § 10.7, at 417 (1978). That author further states that "[c]learly restitution will never be allowed if the only self-interest the plaintiff seeks to advance is to obtain the advantages of a contract without making one." *Id.* Dawson discerns in the cases "a general disposition against intervening to redistribute gains and losses in a market economy in which a preference is expressed for private initiative and private decision." J.P. Dawson, *The Self–Serving Intermeddler*, 87 Harv. L.Rev. 1409, 1412 (1974).

Here, Berry developed his patient following while practicing under the Agreement which is silent as to payment by the P.A. or by remaining shareholders for the goodwill of a voluntarily withdrawing shareholder. As illustrated by specific precedents, the Agreement permitted voluntarily withdrawing obstetricians to take their practice with them, but Berry was unable to continue to practice at all. Berry ultimately elected to be treated as a voluntarily withdrawing shareholder and attempted, in that status, to negotiate for payment for goodwill, without success. Berry claimed the right to sell his patient list to a third party, but did not do so, although there was no wrongful interference by petitioners. Under all of the circumstances of this case, restitution should not be granted to create a liability which the plaintiff could not achieve by bargaining. Consequently, the judgment of the circuit court should not have included $37,500 for goodwill.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN PART AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUN-

TY WITH INSTRUCTIONS TO REDUCE THE JUDG-MENT IN FAVOR OF THE RESPONDENT, F. NORMAN BERRY, BY $37,500.

COSTS IN THIS COURT TO BE PAID BY THE RE-SPONDENT, F. NORMAN BERRY. COSTS IN THE COURT OF SPECIAL APPEALS TO BE PAID TWO-THIRDS BY THE PETITIONERS, BERRY & GOULD, P.A. AND JED D. GOULD, AND ONE-THIRD BY THE RE-SPONDENT, F. NORMAN BERRY.