790 A.2d 43

Samuel **MOGAVERO**

v.

**Larry SILVERSTEIN, et al.**

**No. 87, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Jan. 30, 2002.

John H. Doud III, Baltimore, for appellant.

Marc R. Engel (Melanie K. Snyder and Lerch, Early & Brewer, Chartered on the brief), Bethesda, for appellees.

Argued before SALMON, DEBORAH S. EYLER and MARVIN H. SMITH (Ret., Specially Assigned), JJ.

SALMON, Judge.

The first question presented in this appeal is whether the terms of an employment contract, allegedly entered into between the parties, was definite enough to be enforced. We shall hold that the terms were too indefinite to be enforceable and, accordingly, affirm the trial judge's grant of summary judgment in favor of the defendants on the breach of contract count (Count I).

Another important issue that we must resolve is whether the lower court erred when it granted summary judgment against the plaintiff, Samuel Mogavero, on Count II, in which plaintiff sought damages on the basis of *quantum meruit.* The answer to that question depends upon whether plaintiff was required to prove what the defendants gained by the services he rendered or whether the plaintiff needed only to show the value of his services. We shall hold that the plaintiff must prove what the defendants gained by his services. Here, plaintiff failed to show what defendants gained. Thus, the court did not err in granting summary judgment as to Count II.

## I.

The facts set forth in Part I are presented in the light most favorable to appellant, Samuel Mogavero. *See* Md. Rule 2–501; *see also Jones v. Mid–Atlantic Funding Co.,* 362 Md. 661, 676, 766 A.2d 617 (2001). Appellees, Larry Silverstein ("Silverstein") and Mason Dixon Properties, LLC ("Mason Dixon"), controvert many of those facts.

### A. *Background*

Samuel Mogavero ("Mr. Mogavero") was a successful general contractor from 1972 to 1985. During that period, he owned a construction company called Mogavero and Son, which operated in the Baltimore Metropolitan area. Mr. Mogavero semi-retired in 1985 at age forty-eight. Thereafter, he remained interested in matters relating to construction.

Additionally, he devoted a considerable portion of his time to management of his real estate and other investments.

At all times here relevant, Mr. Mogavero possessed expertise in regard to several subjects, including real estate development, estimating construction costs, and management of construction projects. One of the properties that Mr. Mogavero owned was a former rag factory located in the Fells Point section of Baltimore City. The rag factory was converted by Mr. Mogavero into an upscale residential complex known as King George House.

Silverstein resided at the King George House. As a result, he and Mr. Mogavero met and became good friends. Over a period of years, Silverstein sought Mr. Mogavero's advice and guidance concerning the wisdom of making several real estate investments.

In October of 1997, Silverstein, on behalf of Mason Dixon, became interested in purchasing a collection of older, mostly vacant buildings, located across the street from King George House. Those properties were owned by John Raczkowsky and his wife, Reba. By coincidence, Mr. Mogavero had once tried to purchase the Raczkowskys' property (hereafter "the property"), but his offer had been rejected. Mr. Mogavero told Silverstein that he suspected that the Raczkowskys would now accept a lower price than their earlier demand. Silverstein asked Mr. Mogavero to set up a meeting with the Raczkowskys to see if a purchase agreement could be reached. Mr. Mogavero arranged a meeting with the Raczkowskys and Silverstein. This meeting eventually led to Mason Dixon signing an agreement on December 29, 1997, to purchase the Raczkowskys' property.

Mason Dixon's intended use of the property was to rehabilitate and convert the buildings so they could be rented as upscale commercial units. The cost for rehabilitation was anticipated to be roughly three million dollars. The contract granted the purchaser a feasibility period, which allowed Mason Dixon to avoid purchasing the property if it decided

that its intended use of the property was not economically feasible.

## B. *The Oral Contract—According to Mr. Mogavero.*

In early December 1997, which was prior to the execution by Mason Dixon of the sales contract for the property, Silverstein and Mr. Mogavero had a conversation that Mr. Mogavero contended amounted to an oral contract. An affidavit, sworn to by Mr. Mogavero, sets forth his recollection of the terms of the agreement, *viz:*

> [Silverstein] told me that he needed my help for the project [renovating the property] and asked me what I wanted out of the project. I responded as I have previously testified. Basically I agreed to help him with the construction end of the project in return for a fee of 5 percent of the estimated construction contract. He agreed to these terms and from that time until late July 1998 I worked closely with [d]efendants on the [property].

At deposition, Mr. Mogavero was asked by defense counsel to spell out what was said when he and Silverstein entered into the oral agreement here at issue. Mr. Mogavero's response was as follows:

> [I]n early December, [Silverstein] asked me, well, what was my, what was I interested in[,] in the contract or in the building. And I basically told him that—he more or less asked me, that (sic) he needed my help, what [was] I . . . looking for. And I told him that I would be looking for 5% of the contract and possibly some tax credits, and I was interested in purchasing some tax credits.[1] And I basically told him what I would do. I told him that the fee that other people would charge him would be . . . more in the line of 10 to 15 percent plus cost, and I more or less explained to him what I would do for my fee.

---

1. The tax credits mentioned by Mr. Mogavero apparently referred to credits that are available to owners who redeem "historic" properties.

Mr. Mogavero was then asked, "what did you explain to him" that you would do for your fee? He answered:

I told him that I would help him with the construction, I told him I would get him the architect, I told him I would get him the contractor to do the job, I would check on the construction. I would advise him in reference to the system and the design of the architect. . . . I told him I would monitor the construction phase of the project. And that is basically it.

### C. *Post "Agreement" Events*

In March 1998, Silverstein hired Frank Gant as the project's architect. According to Mr. Mogavero's deposition testimony, an architect was needed to "guide us as to the most productive use of the property." Mr. Gant was recommended to Silverstein by Mr. Mogavero. A surveyor was also hired by Silverstein based upon Mr. Mogavero's recommendation.

During the early planning stages of the project, the question arose as to whether it would be more prudent to put the rehabilitation project out for competitive bids rather than to have a negotiated, fixed-fee contract. Mr. Mogavero voiced the opinion that the most economical way to rehabilitate the property was to select a general contractor and have the general contractor sign a fixed-fee contract. He also advised Silverstein that the best contractor to do the job under a fixed-fee contract was Marlund Contracting Company ("Marlund").

At that time, one of Marlund's project managers was John Mogavero ("John"). John was appellant's son.

Appellant explained in the following words the reasons for his recommendations:

Well, because rehabilitations are unique. They are not like new construction, and there are a lot of unforeseens that you have to deal with. I knew construction, I knew I could handle John [Mogavero] and his boss's construction company to more or less comply with, basically, my demands. I knew that I could nail them down to a solid, no-extra

contract, and it was going to be a fixed fee, but that fee was going to be fixed. There was not going to be another dollar involved in changes of, on anybody's part in reference to additional cost unless they were requested by the owner.

There was a lot of investigation that had to be done in reference to putting the job together. You just could not go out and pick up a set of drawings like Silverstein gave out for bid and give a good price and a solid price that neither he [n]or the contractor could honestly live with, in my opinion, and come and get the job done in a good and orderly fashion, as Silverstein, I am sure, would have wanted. . . .

Silverstein, on behalf of Mason Dixon, accepted Mr. Mogavero's suggestion and contacted Marlund. Silverstein told Marlund's representatives that he wanted to work with them so that they could come up with a fixed-fee contract that would spell out the work to be done and the cost. With that goal in mind, Silverstein also asked Marlund to work with Mr. Mogavero and with the architects. On several occasions Silverstein told Marlund's representatives that Mr. Mogavero was to be "in charge of construction" and that Mr. Mogavero was "his construction guy" whom they should contact if they had any questions or problems regarding construction. It was understood by Marlund, however, that before Marlund could commence construction work on the rehabilitation project a written contract between Mason Dixon and Marlund would have to be executed.

Mark Marquardt, president of Marlund, testified at deposition as follows:

He [Silverstein] indicated that he felt that while, ultimately, a contract would be between Marlund Contracting and Mason Dixon Properties, and he would certainly want to be involved in ultimately what was going to be built and so on because, as any developer, you need to make sure that what you are building suits your tenants and your overall development needs, he indicated that any day-to-day construction interface, oversights dealing with construction issues and

getting answers and so on would be done through Sam [Mogavero].

Between January and July, 1998, Mr. Mogavero met with John and other representatives of Marlund on numerous occasions to discuss the project. And, anticipating that Marlund would be submitting a written, fixed-fee contract, Mr. Mogavero, in April of 1998, took over two-weeks to do a detailed estimate of the cost to rehabilitate the buildings. He made the estimate so that he could compare his figures with those to be submitted by Marlund when it priced the contract. At the end of June, or the beginning of July 1998, Mr. Mogavero participated in a meeting between Silverstein and Mr. Gant to review the status of the plans for the job and to discuss the architect's bill, which Silverstein questioned.

Mr. Mogavero's final meeting with Silverstein took place on July 21, 1998, at Silverstein's apartment. According to an affidavit signed by Mr. Mogavero, the following transpired at that meeting:

Marlund presented its figures to ... Silverstein and me. After reviewing all of the pricing within the concepts of construction we had been following, I directed Marlund to conform its pricing and the concepts we had agreed upon to the existing plans and specifications, so that all parties would understand what was to be done for the money proposed. At the same time, [d]efendant Silverstein accepted the proposal and the dollar figures presented by Marlund, which were within the budget we had been working to meet. He further directed Marlund to submit a written contract embodying the agreement we had just made, so he could submit it to his bankers on the next day. After months of effort and several hours of intense discussions, we ended the meeting with the understanding that a deal had been struck.

A few days after the July 21, 1998, meeting, Silverstein advised Marlund and Mr. Mogavero that he had decided to put the rehabilitation project out for competitive bids rather than accept a fixed-fee contract from Marlund. Silverstein made

this decision without prior notification or consultation with Mr. Mogavero. Mr. Mogavero interpreted Silverstein's action as "effectively terminating my services." According to Mr. Mogavero's affidavit, the reasons for this interpretation were:

7. ... Not only was my authority undermined as far as my future status and authority were concerned, my role was irreparably compromised if I was to be expected to perform the same duties under the new circumstances. After all, I had engaged the contractor, who had worked diligently since January assembling pricing information and responding to other requests that I made upon it. These services were performed with the reasonable expectation that, at the end of the process, it would have a contract to perform the construction work for $3 million dollars. This was no idle hope. Indeed the very plans we were discussing at the meeting of July 21, 1998 expressly listed Marlund Contractors as the general contractor in the cover page. Throughout their involvement, I worked closely with them and the architect and the [d]efendants and others associated with the project to reach the point we did on July 21. In fact, we began that final month with a meeting between the architect and Defendant Silverstein to review the plans being prepared for the job, as well as the architect's fee, which Defendant Silverstein asked me to contest. During that month, Marlund even gave me its billing for some tests, which it had conducted at my request to satisfy the architect's concerns. I passed along the bill to [d]efendants who paid it.

8. However, after [d]efendants had radically altered the course on which we were proceeding with no input from me and to my absolute surprise, my credibility and authority was destroyed with anyone who would be associated with the job thereafter. Clearly, if [d]efendants reneged on the prior shared understandings without any prior notice or input from me, I was no more than an afterthought, whom [d]efendants had apparently decided they did not want. I certainly could no

longer be an effective representative for developers who had abandoned their confidence in me.

9. Worse, from my personal standpoint, the job was not in a position to be let out for competitive bidding. The plans were not complete. They had been developed with the understanding that the job would be negotiated with Marlund and consequently reflected the shared perceptions and concepts, which had been developed to that point. An uninformed bidder simply could not present a realistic bid based upon the state of the plans and specifications as they then existed. The predictable result would be that, instead of having a firm and fixed figure of no more than $3 million dollars, we would then have the prospect of extra-work claims by the new contractor as he encountered necessary work that was not covered in the plans bid on. The first consequence would then be that I would be unable to deliver on one of my fundamental commitments, i.e.[,] to build the project within the budget. Beyond that, the worry would be that I would be held responsible if the budget were exceeded. Under the circumstances, that was a liability I was unwilling to accept without the means to control it.

Because he believed that he had been "effectively terminated," Mr. Mogavero did no further work on the rehabilitation project after he was advised that the project was to be put out for bids.

Mason Dixon obtained title to the property in late August 1998. CAM Construction Company Inc. ("CAM") was the low bidder. In September 1998, Mason Dixon entered into a written agreement with CAM to do the rehabilitation work. Mr. Mogavero filed the subject suit in the Circuit Court for Baltimore City one month after the contract with CAM was signed.

Additional facts will be set forth in order to answer the questions presented.

## II.

### A. *THE BREACH OF CONTRACT COUNT*

In granting summary judgment in favor of appellees as to the breach of contract count, the motions judge opined that the alleged oral contract was too vague to be enforceable. The court said that one could not determine what agreement, if any, was reached between the parties regarding the nature and extent of the duties that Mr. Mogavero had undertaken.

The "extent of duty" problem is most vividly illustrated by what happened after July 21, 1998. There is no evidence, whatsoever, that the parties mutually agreed that Mr. Mogavero had the right *to object* if Silverstein changed his mind and decided to put the rehabilitation project out for competitive bids. Silverstein never promised *to even consult* with Mr. Mogavero if he decided not to enter into a negotiated, fixed-fee contract with Marlund or if he decided to put the project out for competitive bids. Additionally, when promises were exchanged between Silverstein and Mr. Mogavero, the parties never reached an agreement as to what would happen if the construction cost exceeded three million dollars. The parties only agreed that Mr. Mogavero would help Silverstein "with the construction end of the project in return for a fee of 5% of estimated construction contract [costs]." Because of the vague wording of the "oral agreement," there was no basis for Mr. Mogavero to fear that he would be "liable" if costs exceeded three million dollars.

It is to be noted that Mr. Mogavero says in his affidavit that Silverstein's post July 21 actions undermined his (appellant's) "future status and authority." This may be true. But the exchange of oral promises did not spell out what authority Mr. Mogavero had in the first place to control important financial decisions such as whether to sign a fixed-fee contract with Marlund.

We have assumed that Mr. Mogavero is correct when he says in his affidavit that in late July 1998 "the job was not in a position to be let out for competitive bidding." But this allegation is simply another way of saying that Silverstein

made a bad business decision. Based on Silverstein and Mogavero's mutual promises, it is impossible to know whether Mr. Mogavero had the right to override Silverstein's "bad" business decisions or even to be consulted before decisions of this type were made.

What the Court of Appeals said in the seminal case of *Robinson v. Gardiner* 196 Md. 213, 217, 76 A.2d 354 (1950), is here apposite:

> Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. *For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.*

(Emphasis added) (citations omitted). *See also Meyers v. Josselyn,* 212 Md. 266, 271, 129 A.2d 158 (1957) ("There has never been any doubt that when an alleged agreement is so vague and indefinite that the court finds it impossible to determine substantially the full intention of the parties, it must be held unenforceable, because the court cannot make an agreement for the parties.").

We agree with the motions judge that the alleged oral agreement between Mr. Mogavero and Silverstein was too vague and indefinite to be enforceable.

■ As an alternative argument, appellant contends that summary judgment should not have been granted against him as to Count I because, taking the evidence in the light most

favorable to him, appellees are prohibited from denying the contract by principles of estoppel.

■ In *Pavel Enterprises, Inc. v. A.S. Johnson Company, Inc.*, 342 Md. 143, 166, 674 A.2d 521 (1996), Judge Karwacki, for the Court of Appeals, set forth a four-part test to determine whether a party should be deemed estopped from denying the existence of a contract. To be estopped, all four parts of the test must be met. The four parts are:

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the promise.

*Id.*

The problem presented by appellant's estoppel argument is identical to the one already discussed. Here, there was not a clear and definite promise made by either appellant or Silverstein. The alleged agreement was that Mr. Mogavero would help Silverstein "with the construction end of the project." This purported agreement is so vague that there is no way to tell if Silverstein breached it or if Mr. Mogavero breached the contract when he refused to help appellees with the project even though construction had not even commenced.

We conclude that there were no issues of material facts to be decided, as to the estoppel issue, because taking as true all facts set forth in the depositions and affidavits presented to the motions judge, together with all inferences that can be legitimately drawn from those facts, the alleged agreement between the parties is too vague and indefinite to prove the first prong of the test set forth in *Pavel, supra.*

## III.

Appellant alleges that, even if the trial judge was legally correct in granting summary judgment in favor of appellees as to Count I, the lower court nevertheless erred when it granted summary judgment as to Count II, in which appellant sought *quantum meruit* recovery. In this regard, the question that separates the parties concerns proof of damages.

Appellees maintained, and the motions court agreed, that plaintiff was required to prove the value to the *defendants* of the services rendered by Mr. Mogavero. On the other hand, appellant contends that the measure of damages is the reasonable value of the services rendered by him. The measure of damages is here of critical importance because appellant failed to demonstrate that he could produce any evidence as to the reasonable value to appellees of the services he performed. On the other hand, Mr. Mogavero, at least arguably, did produce evidence as to the reasonable value of his services.

■ The Latin term *quantum meruit* means "as much as deserved." *Black's Law Dictionary* 1243 (6th ed.1990). *See also* Candace S. Kovacic, *A Proposal to Simplify Quantum Meruit Litigation*, 35 Am. U.L.Rev. 547, 554 (1986); Arthur L. Corbin, *Corbin on Contracts* § 21, 50–51 (1993).

■ *Quantum meruit* refers to either an implied-in-fact contractual duty or an implied in law (quasi-contractual) duty requiring compensation for services rendered.[2] *See* Dan B. Dobbs, *Remedies* § 4.2, 237 (1973); Corbin, *supra,* at § 1.18; Kovacic, *supra,* at 553; *Dudding v. Norton Frickey & Assoc.,* 11 P.3d 441, 444 (Colo.2000); *Vereen v. Clayborne,* 623 A.2d 1190, 1193 (D.C.1993); *Davies v. Olson,* 746 P.2d 264, 269 (Utah App.1987); *Murdock–Bryant Construction, Inc. v. Pearson,* 146 Ariz. 48, 703 P.2d 1197, 1201 (1985); *Martin v.*

---

**2.** While the weight of authority indicates that *quantum meruit* recovery can be sought as to both contracts implied in fact and contracts implied in law, a few jurisdictions have held that *quantum meruit* recovery only applies to contracts implied in fact. *See, e.g., Paffhausen v. Balano,* 708 A.2d 269, 271 (Me.1998); *Iowa Waste Systems, Inc. v. Buchanan County,* 617 N.W.2d 23, 28–29 (Iowa App.2000).

*Campanaro,* 156 F.2d 127, 130 n. 5 (2d Cir.1946). The distinction between these two forms of *quantum meruit* is important, as the two claims require distinct remedies. *See* Kovacic, *supra,* at 555–56. Nevertheless, neither party discusses this distinction in their briefs.

■■ An implied-in-fact contract is a "true contract" and "means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words." *Mass Transit Administration v. Granite Construction Co.,* 57 Md. App. 766, 774, 471 A.2d 1121 (1984). Implied-in-fact contracts are "dependent on mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required." 17 C.J.S. *Contracts* § 6(b) at 422.

*Williston on Contracts,* vol. 1, section 1.5, pp. 20–21, by Richard A. Lord (1990), says:

The term implied or inferred contract, also sometimes called an implied in fact contract, refers to that class of obligations which arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words. Despite the fact that no words of promise or agreement have been used, such transactions are nevertheless true contracts, and may properly be called inferred contracts or contracts implied in fact.

(Footnotes omitted.)

■ A quasi contract (contract implied in law), on the other hand,

involves no assent between the parties, no meeting of the minds. Instead the law implies a promise on the part of the defendant to pay a particular debt. Thus, the implied in law contract [or quasi contract] is indeed no contract at all, it is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense.

*Mass Transit Administration,* 57 Md.App. at 775, 471 A.2d 1121 (quotations omitted). *See also County Commissioners of*

*Caroline County v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 94–95, 747 A.2d 600 (2000).

The measure of recovery in quasi-contract (implied in law) cases is based upon restitution. *See Mass Transit Administration,* 57 Md.App. at 774, 471 A.2d 1121; *Francis O. Day Co., Inc. v. Montgomery County,* 102 Md.App. 514, 520, 650 A.2d 303 (1994); Kovacic, *supra,* at 556. Restitution, in turn, is referred to as an action for unjust enrichment. *See* George E. Palmer, *The Law of Restitution* § 1.1, 2 (1978); *Mass Transit Administration,* 57 Md.App. at 775, 471 A.2d 1121; *Dashiell,* 358 Md. at 94–95, 747 A.2d 600. In *Berry & Gould v. Berry,* 360 Md. 142, 757 A.2d 108 (2000), the Court of Appeals defined the general principle of unjust enrichment to be:

> A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment.

*Id.* at 151, 757 A.2d 108 (quoting Restatement (Second) of Restitution § 1 (Tentative Draft No. 1, 1983) (Tent. Restatement at 8–9)). Thus, the classic measurement of unjust enrichment damages is the "gain to the defendant, not the loss by the plaintiff." *See Dashiell,* 358 Md. at 95 n. 7, 747 A.2d 600 (quoting *Everhart v. Miles,* 47 Md.App. 131, 136, 422 A.2d 28 (1980)). *See also Mass Transit Administration,* 57 Md. App. at 775, 471 A.2d 1121.

Recovery on a contract implied in fact, on the other hand, is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services. *See* Dobbs, *supra,* at 264; Kovacic, *supra,* at 556. *See also Houston v. Monumental Radio, Inc.,* 158 Md. 292, 308–09, 148 A. 536 (1930) (noting that under an implied-in-fact contract appellant was entitled to the "reasonable worth of his services ... in an action of assumpsit."); *Walker v. Rogers,* 24 Md. 237, 248 (1866) ("[W]here a party is employed to do a specified work ... he may recover upon a ... *quantum meruit* the value of his time

and labor without reference to the benefit or advantage actually derived therefrom by the defendant.").

No Maryland case has been cited, and we have found none, that *explicitly* sets forth the elements that must be proven to establish a contract implied in fact. But cases from other jurisdictions have done so. For example, in *Eaton v. Engelcke Manufacturing, Inc.*, 37 Wash.App. 677, 681 P.2d 1312, 1314 (1984), the court said:

A contract implied in fact

is an agreement depending for its existence on some act or conduct of the party sought to be charged and arising by implication from circumstances which, according to common understanding, show a mutual intention on the part of the parties to contract with each other. The services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and that the recipient expected, or should have expected, to pay for them.

*Johnson v. Nasi,* 50 Wash.2d 87, 91, 309 P.2d 380 (1957). A true implied contract, or contract implied in fact, does not describe a legal relationship which differs from an express contract: only the mode of proof is different. *Johnson v. Whitman,* 1 Wash.App. 540, 545, 463 P.2d 207 (1969)

To the same effect, *see Alonzo Vereen and Technical Data Services, Inc., v. Clayborne,* 623 A.2d 1190, 1193 (D.C.App. 1993).

A category of *quantum meruit* cases relied upon by appellant is that of claims brought by attorneys for compensation under a contingency-fee contract where the client, without good cause, revokes the contract. *See First Union National Bank of Maryland v. Meyer, Faller, Weisman & Rosenberg,* 125 Md.App. 1, 17–25, 723 A.2d 899 (1999), and cases therein cited. Although no Maryland case has explicitly discussed the issue, attorneys discharged without cause who have entered into contingency-fee agreements are entitled to recovery based on contracts implied in fact, inasmuch as (1) the services are rendered under circumstances that indicate

that the attorney rendering the services expects to be paid; (2) the client expects, or should expect, to pay for those services if he discharges his attorney without cause; and (3) there is a meeting of the minds. In contingency-fee agreements there typically is no expressed agreement by the parties as to any alternative measure of compensation for the attorney in the event that the attorney is discharged without cause. And, once discharged, the attorney cannot recover for services rendered under the contingency-fee agreement because its enforcement is barred for reasons of public policy. *See Skeens v. Miller,* 331 Md. 331, 335, 628 A.2d 185 (1993) (An agreement between an attorney and a client is revocable at the will of the client; "[t]his right is deemed necessary in view of the confidential nature of the relationship between attorney and client and the evil that would be engendered by friction or distrust."). Damages in cases where the attorney is discharged without cause are the reasonable value of the services he or she has rendered. *Id.* This is, as we have seen, the remedy for the breach of an implied-in-fact contract. *Id.*

*Petropoulos v. Lubienski,* 220 Md. 293, 152 A.2d 801 (1959), is cited by appellant as "the leading case on proving *quantum meruit.*" In *Petropoulos,* the homeowners refused to pay the builder for services rendered pursuant to a written contract because of a disagreement with the contractor. *Id.* at 296–97, 152 A.2d 801. Due to the disagreement, the contractor stopped work. *Id.* at 299, 152 A.2d 801.

In *Petropoulos,* the Court said:

A contractor who has been wrongfully prevented by the owner from rendering substantial performance, and thus creating a right to the contract price, has, in addition to his remedy in damages as above stated, an alternative restitutionary remedy. This is quantum meruit—*a judgment for the reasonable value of the work, labor, and materials actually rendered and used in performance of the contract* before the defendant's repudiation or other vital breach.

*Id.* at 301–02, 152 A.2d 801 (quoting 5 Corbin, *Contracts,* § 1094) (footnotes omitted) (emphasis added).

Thus, in the *Petropoulos* case, the measure of damages was the reasonable value of the services rendered, which is the type of *quantum meruit* recovery allowed for the breach of an implied-in-fact contract. *See also Hoffman v. Glock,* 20 Md. App. 284, 292–93, 315 A.2d 551 (1974) (quoting *Petropoulos* ).

Also cited by appellant is the case of *Hirsch v. Yaker,* 226 Md. 580, 174 A.2d 728 (1961), where homeowners entered into an oral contract with a builder to make certain home improvements. *Id.* at 581, 174 A.2d 728. The builder (Yaker) completed most of the improvements for which the parties had contracted; Yaker, however, was not entitled to the full contract price because some relatively minor corrections to his work were necessary. *Id.* at 582, 174 A.2d 728. Judge Hammond, for the Court said:

> The appellants argue that the work was never completed and was not accepted by them, and therefore the builder may not have a *quantum meruit* recovery. The rule running through the cases is that where a defendant has actually received and retained the benefit of work and labor done or materials supplied to him, which he has ordered, although not done or supplied in precise conformity with those orders, the law implies an obligation to pay for the net benefit received, and the common count for work and labor done will lie *to enforce that obligation to the extent that, under the circumstances, the labor, services or materials are fairly worth.* 1 *Poe, Pleading and Practice* (Tiffany ed.), Secs. 101 and 105.

*Id.* at 582, 174 A.2d 728 (emphasis added).

The test set forth in *Hirsch* is the test used for an implied-in-fact contract. *See also Merritt Building & Supply Co. v. Shaulis,* 252 Md. 133, 135–36, 249 A.2d 177 (1969).

Another series of *quantum meruit* cases that allow recovery based upon the fair market value of the plaintiff's services (rather than the value to the defendant of the services rendered) concern contracts that were unenforceable by virtue of

the Statute of Frauds. In those cases, an implied-in-fact measure of damages has been utilized. *See Mangione v. Braverman*, 234 Md. 357, 360–61, 199 A.2d 225 (1964). In *Mangione*, the plaintiff entered. into an oral agreement with defendants, under which plaintiff was to build an apartment house. *Id.* at 360, 199 A.2d 225. After plaintiff had performed various services worth over $7,000, defendants backed out of the agreement and failed to fulfill their contractual duties. *Id.* Plaintiff brought suit but could not successfully sue on the contract because the agreement was unenforceable under the Statute of Frauds. *Id.* The Court, however, allowed recovery, stating that "under a contract unenforceable because of the Statute of Frauds, [a plaintiff] may recover on the common counts on a *quantum meruit* basis *for the fair value of ... services rendered ....*" *Id.* at 360–61, 199 A.2d 225 (emphasis added). To the same effect, *see Duck v. Quality Custom Homes, Inc.*, 242 Md. 609, 220 A.2d 143 (1966), and *Stevens v. Bennett*, 234 Md. 348, 199 A.2d 221 (1964).

An additional grouping of cases that allowed for *quantum meruit* recovery of the fair market value of services rendered involved claims brought under general employment contracts where, at defendant's request, specific services were rendered. In *Keedy v. Long*, 71 Md. 385, 18 A. 704 (1889), the Court held that when a servant has been wrongfully discharged "he may treat the contract of hiring as rescinded, and sue his master on a *quantum meruit* for the services he has actually rendered." *Id.* at 389–90, 18 A. 704. This measure of recovery has been approved by several cases, the most recent being *Battaglia v. Clinical Perfusionists, Inc.*, 338 Md. 352, 658 A.2d 680 (1995). In *Battaglia*, the Court, citing *Keedy*, stated that when an employment contract has been terminated "back wages may be recovered ... by claiming the value of the work performed (*quantum meruit*)...." *Id.* at 358, 658 A.2d 680. Those employment cases, however, can be distinguished from the one at bar in that here there was no meeting of the minds as to the nature and extent of appellant's duties under the "contract."

■ The Maryland cases seem to abide generally by the rule that if specific services are requested by the defendant, the contract is treated as one implied in fact and recovery is allowed for the reasonable value of the plaintiff's services; but if there is no meeting of the minds as to what services are to be rendered, the contract is treated as one implied in law, where the measure of damages is the amount, if any, of the defendant's gain—not the reasonable value of plaintiff's services.

As to the case at bar, it cannot be said that the parties entered into a contract implied in fact. The facts in this case are distinguishable from any of the cases where the Maryland courts have awarded implied-in-fact damages. In cases where implied-in-fact damages were found to be due, there was in every case a meeting of the minds as to the nature and extent of the duties undertaken by the plaintiff on behalf of the defendant. Here, as already demonstrated, there was no such meeting of the minds. To reiterate what was said in *Williston on Contracts*, for an implied-in-fact contract to exist, the obligation must arise "from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words," *Williston, supra,* vol. 1, § 1.5, pp. 20–21, and there must be a meeting of the minds. 17 C.J.S. Contracts § 6(b) at 422. Thus, no contract can be inferred; and if a contract cannot be inferred, no implied-in-fact contract can be said to exist. *Williston, supra,* vol. 1, § 1.5, pp. 20–21.

■ On the other hand, appellant did prove an implied-in-law contract with appellees. While "no assent between the parties [and] no meeting of the minds" was proven, the law nevertheless "implies a promise on the part of the defendant[s] to pay." *Mass Transit Administration,* 57 Md.App. at 775, 471 A.2d 1121. In such situations, the law requires "restitution to the plaintiff of something that came into defendant[s'] hands but belongs to the plaintiff in some sense." *Id.* Mr. Mogavero failed to prove the value to the defendants of the services he rendered. Because restitution damages are the same as damages recoverable for unjust enrichment, *Ber-*

*ry & Gould,* 360 Md. at 151, 757 A.2d 108, and because the measure of damages for unjust enrichment is the gain to the defendant, not the loss by the plaintiff, the motions judge did not err when she granted summary judgment as to Count II.

Appellant argues, in the alternative, that he did proffer some evidence as to what appellees gained by his services. He points out that he hired, on behalf of the defendants, a surveyor whose name he cannot remember. The price the unnamed surveyor charged was $5,000 less than the price proposed by a surveyor recommended by Mr. Gant—the architect for the project. Although Mr. Mogavero did not say how much the surveyor he recommended charged, he argues that the recommendation resulted in a $5,000 gain by the defendants. This could possibly be true if we only knew more facts. But we do not know whether the defendant even considered hiring the person recommended by Mr. Gant or whether other surveyors may have been considered who charged the same as (or less) than the surveyor recommended by appellant. Moreover, we do not know if the surveyor recommended by Mr. Gant was to do the same work as the work performed by the surveyor recommended by Mr. Mogavero. In short, appellant failed to proffer evidence showing the gain to defendants resulting from his recommendation.

Appellant also claims that he saved defendants $40,000 by telling Silverstein not to hire an engineer "to design an electrical/mechanical drawing on the job." Such a drawing had been recommended by Mr. Gant. Mr. Mogavero testified (ambiguously) that he told Silverstein that the contractor that was bidding on the job [presumably referring to Marlund] would "design it and guarantee the performance of it." Nevertheless, appellant produced no evidence that Marlund, or anyone else, in fact, made such a drawing for free, and therefore no evidence was proffered as to what, if anything, appellees saved. The proffered evidence as to the gain received by defendants as a result of the implied-in-law contract was insufficient to create a jury issue.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**