66 A.3d 71

**BRAULT GRAHAM, LLC, et al.**

v.

**The LAW OFFICES OF PETER G. ANGELOS, P.C.**

**No. 2887, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

May 3, 2013.

**640**

642

Albert D. Brault, (Brault Graham, LLC, Rockville, MD, William F. Gately, Howell & Gately, Towson, MD), on the brief, for Appellant.

Benjamin Rosenberg, (Andrew H. Baida, Stuart A. Cherry, Rosenberg, Martin, Greenberg, LLP, on the brief), Baltimore, MD, for Appellee.

Panel: EYLER, DEBORAH S., GRAEFF and HOTTEN, JJ.

GRAEFF, J.

This appeal arises out of a suit filed in the Circuit Court for Baltimore County by The Law Offices of Peter G. Angelos, P.C. ("PGA"), appellee, against Brault Graham, LLC ("BG"), William Gately, Esquire, and Albert D. Brault, Esquire (collectively "appellants"), seeking recovery of attorneys' fees.[1]

---

1. The Complaint also named as defendants Mrs. Carole Bargar and her daughters, as personal representatives of the Estate of Harry R. Bargar, Jr., and the law firm of Howell & Gately. At the conclusion of the case, with the apparent agreement of the parties, these defendants were dismissed with prejudice. They are not parties to this appeal.

Harry Bargar, now deceased, and Carole Bargar initially retained PGA, pursuant to a contingency fee agreement, to represent them in a complex medical malpractice case against various parties in *Bargar, et ux. v. MidAtlantic Cardiovascular Associates, P.A., et al.*, Case No. 03–C–04000132, in the Circuit Court for Baltimore County. Mr. Gately, who was then employed by PGA, assisted by Mr. Brault, represented the Bargars on PGA's behalf for nearly five years. After a trial, a jury found in favor of the Bargars, awarding them a judgment in excess of $5 million. This Court vacated the judgment on evidentiary grounds in an unreported opinion, *Sell, et al. v. Bargar, et ux.*, No. 408, Sept. Term, 2006 (filed Mar. 17, 2008), and remanded the case for a new trial.

At some point prior to this Court's decision, PGA terminated its relationship with Mr. Gately, with an effective date of April 30, 2008. The Bargars then discharged PGA and retained Mr. Gately and Mr. Brault under a new retainer agreement, which provided for a contingent fee of 40% in the event of recovery. Mr. Gately and Mr. Brault represented the Bargars for the next 18 months, ultimately settling the case for an undisclosed amount. The agreed contingency fee to Mr. Gately and Mr. Brault was deposited into BG's escrow account.

PGA then filed a quantum meruit claim in the circuit court, seeking to recover a percentage of the contingency fee paid to Mr. Gately and Mr. Brault. After a three-day bench trial, the circuit court granted judgment in favor of PGA and ordered Mr. Gately and Mr. Brault to pay PGA 65% of the fees recovered.

On appeal, appellants present two questions for our review,[2] which we have rephrased as follows:

---

**2.** Appellants presented the following questions:

    1. In a contingent fee situation, where a law firm decides unilaterally to discharge its attorneys then representing the clients, without cause or client consent or participation in the decision, does the law firm forfeit any claim to fees earned by the discharged attorneys who later obtain recovery for the clients?

1. Did the circuit court properly find that PGA was entitled to recover quantum meruit attorney fees?

2. Did the circuit court properly consider evidence of fee-sharing agreements with Mr. Gately and Mr. Brault?

For the reasons set forth below, we answer the first question yes, holding that the circuit court properly found that PGA was entitled to quantum meruit fees. With respect to the second question, however, we disagree with the court's analysis regarding fee-sharing agreements. Accordingly, we shall vacate the judgment and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

On January 8, 2001, Mr. Bargar arrived at St. Joseph's Hospital emergency room in cardiac distress. Mr. Bargar was informed that Dr. Mark Midei, who ran the cardiac catheterization lab, had determined that Mr. Bargar needed a "re-do" bypass surgery. Mr. Bargar requested that the surgery be performed by Dr. Peter Horneffer, a cardiac surgeon with Cardiac Surgery Associates, P.A. ("CSA"), who previously had performed bypass surgery on Mr. Bargar in 1992. Dr. Timothy Bessent, an emergency room physician, told Mr. Bargar, falsely, that Dr. Horneffer was not available to do the surgery. He said that Dr. Jeffrey Sell, a cardiac surgeon who, along with Dr. Midei, was associated with Midatlantic Cardiovascular Associates, P.A. ("Midatlantic"), a group of cardiac surgeons and cardiologists, would perform the surgery. The following day, Dr. Sell performed the bypass surgery on Mr. Bargar. On January 19, 2001, three days after Mr. Bargar was discharged, he suffered a massive heart attack and was left severely disabled.

At the time Dr. Sell performed the surgery on Mr. Bargar, CSA and Midatlantic were involved in a longstanding dispute.

---

2. Where a law firm seeking *quantum meruit* recovery of contingent fees earned by attorneys formerly retained but discharged by the firm, should the trial court consider evidence of the firm's fee-sharing agreements with each of the attorneys and reduce any firm recovery in accordance with those agreements?

In February 2001, CSA and its affiliated surgeons, including Dr. Horneffer, retained PGA to represent them in a suit against Midatlantic (the "CSA case"), for unfair competition in hiring surgeons and unfair trade practices, including lying to patients regarding surgeon availability. Mr. Gately and another PGA attorney, H. Russell Smouse, along with Kathleen McDermott, who was retained as outside counsel as an expert in federal health care law, Medicare, fraud and abuse law, were counsel of record in the CSA case.

In September or October 2003, Mr. Bargar asked Dr. Horneffer about Mr. Gately's representation of CSA. Dr. Horneffer, who had worked closely with Mr. Gately in the CSA case, advised that he thought that Mr. Gately was an excellent lawyer.

Mr. Gately testified that, after he met with the Bargars and reviewed their potential claims against St. Joseph's Hospital and the physicians involved in his surgery, he recommended to Mr. Angelos that PGA take the case, thinking that the case had potential claims for both medical malpractice and fraud. Mr. Angelos directed Mr. Gately, who had limited experience in medical malpractice, to investigate the matter further, and Mr. Gately met with Thomas Summers, chairman of the medical malpractice department at PGA.

On October 23, 2003, Mr. Bargar entered into a contingent fee retainer agreement with PGA, in which he agreed to pay PGA 40% of any settlement, verdict, or recovery in the case, plus PGA's reimbursable out-of-pocket expenses. Mrs. Bargar entered into a similar agreement on November 3, 2003.

Mr. Gately was a direct employee of PGA at the time the retainer agreements were executed.[3] He testified that he was

3. According to Mr. Gately's September 20, 2010, affidavit, in March 1999, he and H. Thomas Howell formed the law partnership of Howell & Gately, which became affiliated with PGA from 1999–2008 in what essentially was an "of counsel" relationship. Mr. Gately also was a direct employee of PGA for a four-month period from September 1, 2003, through December 31, 2003. Effective December 31, 2003, Mr.

advised that, as a direct employee, he would receive 25% of the fee of any case he brought into the firm. A "general case intake sheet" prepared for the new case file provided for a 25% split fee arrangement between PGA and Mr. Gately.[4]

In December 2003, Mr. Gately, with the assistance of Mr. Summers, drafted a complaint against Midatlantic, Dr. Midei, Dr. Sell, and other defendants, alleging, *inter alia*, medical malpractice, fraud, battery, and failure to obtain Mr. Bargar's informed consent for the surgery (the "Bargar case"). The complaint initially was filed with the Health Claims Arbitration Office, and on January 6, 2004, the case was removed to the circuit court. Although Mr. Gately believed that Mr. Summers would handle the medical malpractice aspects of the Bargar case, Mr. Summers withdrew from the case with Mr. Angelos' permission soon after the complaint was filed. From February 2004 through April 2005, Mr. Gately, despite numerous requests to Mr. Angelos for assistance with the medical malpractice matters, was the only attorney handling the Bargar case. He handled "voluminous and very involved" preliminary motions, conducted depositions, and met with the Bargars "constantly."

In April 2005, Mr. Gately was advised that Mr. Angelos had authorized him to engage Mr. Brault's services to handle the medical malpractice aspects of the litigation. There was no discussion about Mr. Brault's fee until after the jury verdict. Mr. Gately recommended to Mr. Angelos that Mr. Brault receive a 25% to 30% fee, but Mr. Angelos refused. Following Mr. Gately's discharge from PGA, however, Mr. Smouse advised that Mr. Angelos had agreed that Mr. Brault was entitled to 25% of the Barger fee.[5]

---

Gately's direct employment with PGA was terminated, and his employment relationship reverted back to the original arrangement.

4. Mr. Gately testified that he did not see the signed form until after his discharge from the firm.

5. At another point during the hearing, Mr. Gately stated that Mr. Smouse advised that Mr. Brault was entitled to 20% of the fee. PGA

On December 16, 2005, after more than three weeks of trial, the jury returned a verdict in favor of the Bargars, awarding $2,253,250 in compensatory damages against Midatlantic, Dr. Midei, and Dr. Sell, based on a failure to obtain Mr. Bargar's informed consent, battery, and fraud. The jury also awarded the Bargars $2,750,000 in punitive damages against Midatlantic based on fraud. The jury found no liability for medical malpractice. PGA agreed that the verdict was the product of the "phenomenal job" by Mr. Gately and Mr. Brault.

The Midatlantic defendants appealed the judgment to this Court. The issues were briefed in 2006 with the assistance of Mr. Howell, who was retained to assist Mr. Gately with the appellate proceedings, and who was compensated by PGA for his services in that regard. On March 7, 2007, the case was argued in this Court. On March 17, 2008, this Court vacated the judgment and remanded the case for a new trial based on evidentiary grounds. Between oral argument and the filing of this Court's opinion, no work was done on the Bargar case. On April 10, 2008, Mr. Gately and Mr. Brault filed a Motion for Reconsideration in this Court, which was denied.

At some point prior to this Court's decision, the relationship between Mr. Gately and PGA had "significantly deteriorated," and Mr. Gately was informed that PGA would terminate its association with him, effective April 30, 2008. In the interim, there was discussion regarding who would notify the Bargars that Mr. Gately no longer would be employed by PGA. According to Mr. Gately, on April 15, 2008, after PGA failed to make arrangements for handling the Bargar case and failed to advise the Bargars of their dissociation with Mr. Gately, Mr. Gately mailed the following letter to the Bargars:

Please be advised that Peter G. Angelos on behalf of the law offices of Peter G. Angelos decided to sever his relationship with William F. Gately and Howell & Gately. As a result, Mr. Gately will no longer be in a position to work on the case on behalf of the law offices of Peter G. Angelos.

---

asserted in opening statement that the fee agreement between PGA and Mr. Brault was for 20%.

As the clients involved, you have the right to determine your future representation. You may continue to be represented by the law offices of Peter G. Angelos without the involvement of Mr. Gately. On the other hand, you may discharge the law offices of Peter G. Angelos as your attorneys and retain the services of Mr. Gately.

Finally, you may discharge the law offices of Peter G. Angelos and retain any other lawyers or law firms of your choosing. The determination of counsel is always the right of the client.

On April 16, 2008, Mr. Angelos sent a letter to the Bargars on behalf of PGA. That letter provided:

I received yesterday afternoon a copy of Bill Gately's letter to you of April 15, 2008.

Please be advised that this office would welcome the opportunity to continue your representation in the matter addressed in Mr. Gately's letter and to provide appropriate staffing to ensure that your interests are properly and vigorously represented.

Our commitment to you is evidenced by the many hundreds of man hours devoted to your representation at very considerable expense as well as the other substantial expenses advanced in prosecuting your case and in attempting to preserve the verdict on appeal.

We would be most happy to meet with you at your convenience to discuss how we could proceed as counsel on your behalf. If you would give me a call upon receipt of this letter, such a meeting could be promptly arranged.

It is accurate, as Mr. Gately points out, that you have a choice in the matter. We hope that the choice that you make is to continue with this firm as your counsel.

The Bargars received PGA's letter, which was hand-delivered, before they received Mr. Gately's mailed letter. Mrs. Bargar stated in an affidavit that, upon receipt of Mr. Angelos' letter, the Bargars were "shocked" and "disturbed at the content of the letter which indicated that Mr. Gately would no longer be representing [them]." They were "totally unaware

of any difficulties" between Mr. Gately and PGA or of any "potential disassociation" between Mr. Gately and PGA.

After receiving Mr. Gately's letter, the Bargars decided immediately to discharge PGA and retain Mr. Gately and Mr. Brault to represent them. There was no question in their minds that they wanted Mr. Gately and Mr. Brault to "continue handling the case because of their prior handling of the matter and their dealing with us and our confidence in them." Ms. Bargar stated that, to their knowledge, "no other lawyer knew anything about the case," and they "wanted the same lawyers who had been successful in the past to continue with the matter."

On April 19, 2008, the Bargars mailed the following letter, drafted by Mr. Brault, to Mr. Smouse of PGA:

We learned that Mr. Angelos decided several days ago to sever his relationship with William F. Gately and that as a result, Mr. Gately will no longer be able to represent us if we continue to be represented by the law offices of Peter G. Angelos. In light of this situation, we hereby discharge the law offices of Peter G. Angelos, P.C. as our attorneys in the litigation against Drs. Midei, Sell and Midatlantic Cardiology Associates, P.A. We have elected to engage Mr. Gately and Mr. Brault to represent us in the matter henceforth. We trust that the file can be transferred to them in a timely fashion so that our interests will be protected.

Mrs. Bargar later testified in a deposition, the transcript of which was admitted at trial in this case, that there was no interruption in the legal services provided in the Bargar case after the Bargars discharged PGA and retained Mr. Gately and Mr. Brault. She also testified that she and Mr. Bargar had "every confidence in" Mr. Gately and Mr. Brault, and that Mr. Gately and Mr. Brault had been "very aggressive and very compassionate and [they] saw no need to go anywhere else."

Between October 30, 2003, and April 30, 2008, PGA paid Mr. Gately $1,193,016 in compensation. In addition, PGA paid a total of $252,695 to employ a full-time assistant for Mr. Gately.

PGA also incurred direct expenses of $74,503.99 in connection with the Bargar case, including the $53,338.73 in fees that it paid to Mr. Howell and to other outside counsel, Blank Rome, LLC and Ms. McDermott, to assist Mr. Gately with various aspects of the case, and $21,165.26 in other expenses.

After April 30, 2008, when Mr. Gately no longer was employed by PGA, Mr. Gately and Mr. Brault continued their representation of the Bargars pursuant to a contingent fee agreement providing that, in the event of settlement or favorable judgment, the Bargars would pay them a 40% contingency fee out of "the gross amount recovered" on the Bargars' behalf, minus costs and expenses. That representation included a July 10, 2008, petition for certiorari in the Court of Appeals, which was denied on August 26, 2008.

Meanwhile, on May 6, 2008, PGA sent a letter to Mr. Gately and Mr. Brault asserting its statutory attorney's lien on any settlement or judgment, stating:

> Pursuant to Section 10–501 of the Business Occupations and Professions Article of the Maryland Annotated Code and Maryland Rule 2–652; this firm hereby places you on notice that in the course of its representation of the Bargars it incurred substantial expense both for significant investment of legal time and for out-of-pocket expenses it advanced. Its fee arrangement with the Bargars was contingent and, consequently, it has received neither compensation for this legal representation nor reimbursement of these expenses. Thus, it has a substantial interest in any settlement, award or judgment made in the Bargar's favor stemming from this litigation.
>
> The Law Offices of Peter G. Angelos, P.C. hereby directs you, under the terms of the statute, to hold and preserve any money payable or property passing to the Bargars relating to the above-captioned matter so that the adjudication of its rights, pursuant to Rule 2–652(c), will not be prejudiced.

On September 25, 2009, Mr. Gately and Mr. Brault settled the Bargars' claims for a confidential amount. On November

24, 2009, the Bargars dismissed, with prejudice, their claims against Midatlantic, Dr. Sell, and Dr. Midei. Mr. Gately and Mr. Brault retained 40% of the settlement proceeds, plus reimbursable expenses, in a BG escrow account.

On March 29, 2010, after filing an initial motion in January, PGA filed an Amended Motion to Enforce Attorney's Lien on the proceeds of the settlement. It noted that it had represented the Bargars for more than four years, from October 2003 through April 2008, including trying the case and handling the appeal in this Court, with a 40% contingency fee agreement. PGA sought either: (1) a statutory attorney's lien, pursuant to Md.Code (2009 Supp.) § 10–501 of the Business Occupations & Professions Article, on the settlement proceeds in the amount of 40% of the gross amount of the settlement, together with the expenses PGA disbursed on the Bargar's behalf; or (2) in the alternative, "an amount in *quantum meruit*, based on a percentage of the total fee payable by [the Bargars], said amount to be determined by the [c]ourt," to compensate PGA for its services to the Bargars, asserting that "the settlement of this case was in very significant measure due to PGA's efforts."

On December 10, 2010, prior to a ruling on this motion, PGA filed its initial complaint in this case seeking quantum meruit recovery against Mrs. Bargar,[6] the personal representatives of Mr. Bargar's estate, Mr. Gately, Howell & Gately, Mr. Brault, and BG. The complaint also contained a count for tortious interference with contract against Mr. Gately, alleging that Mr. Gately "intentionally and fraudulently induced the Bargars to terminate PGA as their attorney by ... falsely representing to the Bargars that PGA had no attorney who could effectively prosecute the Bargar [case] after [Mr.] Gately left PGA."

On March 24, 2011, the court held a hearing on the Amended Motion to Enforce Attorney's Lien. It denied the motion, noting that PGA had filed a complaint seeking recovery under

6. Appellants advise that Mr. Bargar died on September 17, 2010.

a quantum meruit theory, which it determined was the appropriate forum for the resolution of the issue.

On July 21, 2011, PGA filed a Second Amended Complaint for *Quantum Meruit*. The complaint asserted that PGA was entitled to "a substantial portion of the contingent fee that was paid to, and is being held by, Gately and Howell & [Mr.] Gately and/or [Mr.] Brault and Brault Graham ... for the services PGA provided and the expenses it disbursed on behalf of the Bargars from October 23, 2003 through April 19, 2008." PGA requested "*quantum meruit* judgment against Defendants measured by the reasonable value of the services PGA provided and the expenses it disbursed on behalf of the Bargars."

During the ensuing discovery prior to trial, PGA asked in an interrogatory whether the settlement of the Bargar case "was in whole or in part not the result of work performed on behalf of the Bargars by PGA prior to April 19, 2008." In their answer, Mr. Gately and Mr. Brault responded that the settlement "was wholly the result of a combination of" thirteen separate outside factors, unrelated to work performed by PGA, including a federal investigation of Midatlantic and public disclosure of a stent scandal. In a deposition, however, Mr. Gately stated that the settlement occurred because "[w]e got lucky because things happened that had nothing to do whatsoever with the work we had done back in 2004 or the trial or anything else, nothing that [PGA] had done. We just got lucky. We took a greater risk and God rewarded us."

On January 4, 5, and 20, 2012, the court held a non-jury trial. During trial, Mr. Gately agreed that he and Mr. Brault had nothing to do with those thirteen events he attributed to bringing about a settlement, and he reiterated that they "were lucky those events occurred on our watch," and they "became fortunate." When asked whether it was his view that none of the work that was done during his association with PGA prior to April 30, 2008, contributed to the settlement in the Bargar case, Mr. Gately responded: "I don't think I would make an extreme statement like that." Nevertheless, Mr. Gately took

the position that the "wealth of knowledge" that he and Mr. Brault had accumulated about the Bargar case while working for PGA "didn't amount to a row of pins in terms of the way [they] manoeuvred [sic] this thing to a settlement in light of the subsequent events." At trial, however, PGA admitted into evidence an email to counsel for Midatlantic, dated April 1, 2009, wherein Mr. Brault indicated that the Bargars' settlement demand was "based on the verdict that we obtained in December, 2005," plus post-judgment interest.

Mr. Gately agreed that the verdict was obtained while he was associated with PGA and that the docket entries in the Bargar case, numbered 1 through 326, reflected work that had been done on the case while he was working for PGA. He opined that the effect of PGA "telling the Bargar[s] that [they] couldn't have the lawyers that they had" throughout nearly five years of litigation, and through the verdict and remand, "was essentially an abandonment of their interest. They discharged [PGA] .... [and] that discharge entitled [PGA] to no fee whatsoever."

Mr. Gately testified that he had a 25% "split fee" agreement with PGA, whereby he would receive 25% of any fee obtained by PGA in the Bargar case. He explained that, in August 2003, when Mr. Angelos suggested that Mr. Gately become a direct employee of PGA, Mr. Smouse told Mr. Gately that, in the capacity of a direct employee, he would receive certain benefits, including a 25% fee for any matter he brought to the firm. After the Bargars retained PGA, Mr. Gately made a request for the 25% fee on an intake form, but he did not fill out the amount of the fee. Mr. Gately never discussed the matter with Mr. Angelos or Mr. Smouse prior to leaving PGA in 2008, and he did not find out that intake form listing a 25% split fee had been signed until after his discharge, when he found the intake form filled out in the Bargars' case file.

Paul Raschke, an attorney employed by PGA, testified that, in November 2009, Mr. Gately told him that PGA had rejected his request for a 25% fee in the Bargar case, but he wanted PGA to reconsider in light of the Bargar settlement. Mr.

Raschke conveyed that information to Mr. Smouse and to Mr. Angelos, but they did not reconsider Mr. Gately's request. Mr. Raschke testified that the fee-split request had been rejected by Mr. Smouse and "had never been seriously considered."

Mr. Gately disagreed with Mr. Raschke's recollection of these events. He asserted that he never said that his request for a 25% fee split was denied in 2003, but rather, he said that the request was denied when he asserted it during his discharge.

Ward Coe testified on behalf of PGA regarding the ethical implications of a lawyer leaving a law firm and how to value legal services on a quantum meruit basis. He testified, to a reasonable degree of professional certainty, that the transition of the Bargar case from PGA to Mr. Gately and Mr. Brault at the end of April 2008 was handled in an ethically proper manner. He explained that lawyers leaving law firms happens "with some frequency now and something has to be done with their clients' cases." When such a transition occurs, there are "two primary ethical considerations": (1) advising the client of the status that the lawyer handling their case is leaving the firm; and (2) giving the client a choice of lawyer. Mr. Coe observed that both letters to the Bargars appropriately advised them of these considerations. Once the Bargars chose to discharge PGA and retain Mr. Gately and Mr. Brault, PGA's "only ... remaining obligation was to cooperate in the transition of the file to" Mr. Gately and Mr. Brault. Mrs. Bargar's testimony, indicating that there was no interruption in service as a result of the transition, confirmed that the transition was ethically proper.

Mr. Coe did not agree with Mr. Gately that PGA had forfeited its right to a quantum meruit share of the attorney's fees in the Bargar case based on abandonment, explaining that, in order for a discharged attorney to forfeit a fee, the attorney must have committed misconduct materially prejudicing the client's case. He testified that there was no basis to conclude that PGA abandoned the Bargars, noting that it

represented the Bargars from November 2003 until the letter of discharge came from the Bargars, and PGA "represented them with a very high level of competence, and the representation continued without interruption by Mr. Gately and Mr. Brault after [PGA] was discharged." Mr. Coe believed that PGA's offer to the Bargars to continue its representation of them was genuine, and PGA had lawyers equipped to take over the case.

With respect to the value of the legal services and the appropriate allocation of fees under a quantum meruit theory, Mr. Coe compared the benefit of the services PGA provided to the Bargars with the services provided by Mr. Gately and Mr. Brault after the Bargars discharged PGA, and he concluded that 95% of the value to the Bargars occurred while the case was at PGA. He based this conclusion on three different methods of analysis.

First, he looked at the docket entries before and after PGA's discharge through the date of settlement. He calculated that 326 of the 342 docket entries, or approximately 95%, were attributable to work done while PGA was handling the Bargar case.

Second, he looked at the "total time involved," noting that PGA devoted a "total of 41 months of engagement on behalf of the Bargar[s] in a very intense way," compared to three months of active work undertaken by Mr. Gately and Mr. Brault after the Bargars discharged PGA. Thus, PGA was responsible for 93% of the total time incurred in the Bargar case.

Third, Mr. Coe examined the parties' respective representation of the Bargars under the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), in particular, Rule 1.5, concerning the reasonableness of attorney's fees. He concluded that, based on the time, labor, and skill involved, and the complexity of the issues in the Bargar case, as well as the result obtained while the case was at PGA, the value of the services the Bargars received while PGA handled their case entitled PGA to a substantial portion of the attorney's fees.

Mr. Coe stated that, had PGA not determined to file a lawsuit, or had it lost early motions to dismiss, or for summary judgment, or the jury trial, or the appeal in its entirety, the case never would have reached settlement.

Robert Michael testified on behalf of Mr. Gately and Mr. Brault as an expert in ethical obligations in protecting a client's interests. In Mr. Michael's opinion, to a reasonable degree of professional certainty, PGA forfeited its right to recover a fee in quantum meruit because it abandoned the Bargar case. Mr. Michael opined that, in medical malpractice cases, "examining docket entries to see what kind of motions and things have been pled . . . is just not an acceptable or an appropriate way to look and evaluate the level of the work that has been done." He noted that, prior to the time that Mr. Gately successfully persuaded PGA to allow him to retain Mr. Brault to handle the medical malpractice portion of the case, PGA gave Mr. Gately "essentially . . . [no] help at all with this case." Mr. Michael equated that "pattern of conduct" to ignoring the interests of the client.

Mr. Michael also was critical of PGA's actions when the issue of terminating Mr. Gately's employment arose at the beginning of April 2008, opining that PGA should have "made an arrangement with Mr. Gately and Mr. Brault to continue with" the case following PGA's discharge of Mr. Gately. Mr. Michael did not believe that the Bargar case was the type of case that easily could be transferred to a new attorney, and the course of action PGA took concerning Mr. Gately and his representation of the Bargars effectively removed the case from the firm and constituted abandonment. Mr. Michael also opined that, after the case was remanded by this Court, it "wasn't the same case anymore." He agreed that the transition of representation did not prejudice the Bargars' case, due to the "intervention of Mr. Gately and Mr. Brault," but he stated that the "potential for prejudice was there." Mr. Michael did not testify to the value of the legal services provided to the Bargars on a quantum meruit basis.

At the conclusion of trial, the court rendered its decision from the bench. Initially, it found no merit to the argument that PGA abandoned the Bargars and forfeited its fee.

After finding that a quantum meruit fee was appropriate, the court stated that the second issue was "where does that fee come from." The court noted Mr. Brault's position that "there can be no cause of action against a successor lawyer and that in effect it has to come as a second fee from the client." The court disagreed, stating:

There is no additional fee owed by the Bargars. That any quantum meruit that this court finds comes out of the already fulfilled contingency. The cases are very clear on that, that it doesn't accrue until the contingency is actually fulfilled, which has been done in this case.... Any quantum meruit fee that is owed ... shall be paid from the already accrued and earned 40 percent contingency fee ... that has already been paid by the Bargars out of this settlement.

The court then stated that the final issue for the court to determine was the proportion of the already earned 40% contingency fee to which PGA was entitled. Because the settlement was confidential, the court stated that it would determine that amount by percentage.

The court noted that there was no dispute that PGA was entitled to its expenses of $21,165.25, and it deducted those expenses first. The court next addressed, "from the balance owed, what, if any, quantum meruit is the firm entitled to." In that regard, it looked at two things. First, it considered the testimony of Mr. Coe, who "analyzed the work done both on docket entries, time and labor and analyzed it as a 95/5 percent." The court then "looked specifically at [MLRPC] 1.5 that list[s] the factors that are to be considered in evaluating how much is owed to an attorney." With respect to these factors, the court stated:

I considered the first factor, time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly. Clearly there has been no dispute that while the case was in [PGA],

that it was worked on primarily by Mr. Gately and it was a complex medical malpractice case, significant time was spent by Mr. Gately while he was under the auspices of [PGA] and that the skill requisite was a high skill and that he performed that skill well, ultimately with the assistance of Mr. Brault, who was brought in about a month or two before the case was to be tried, at least the first trial date. So, the [c]ourt considered the complex nature of it, the time required while the case was in [PGA], which was ... from October of 2003 until April of 2008. So, around four and a half to not quite five years. So, I have considered that. I considered the amount involved and the rul[ings] obtained. I considered the fact that it went to trial, the amount of work that went into pretrial motions, in terms of discovery that was testified to, in terms of the work that was done for the trial. The [c]ourt recognizes the complexity of the case, the fact that this was not just a medical malpractice case, but also a fraud case, which is certainly not an easy case to prove, but it was done successfully by Mr. Gately while he was working ... for [PGA] where he was able to receive a multi-million dollar verdict of 5 million dollars in December of 2005. I considered the fact that the case was ultimately appealed, the work that was done, again, still ... under the auspices of [PGA] in terms of ... the case being appealed, addressing the appeal, writing the briefs, argu[ing] the appeal and then I understand that the case was sent back.... I considered the nature and length of the professional relationship with the client. That [PGA] represented the Bargars from October of 2003 until they were discharged in April of 2008. Then there was what seemed to be a seamless transfer of the file to Gately and Brault for continuation of representation from April of 2008 until the case was settled in 2009. I considered the experience, representation and ability of the lawyers performing the services and the fact that the fee was contingent. I also considered the testimony of Mr. Gately in terms of the work that he performed following his discharge from the firm when he picked up the file and undertook with Mr. Brault

the representation to conclusion. I considered the work that was done, and although there are not as many docket entries and perhaps not as much substantive pleadings or another trial certainly, I considered the work that he did to ultimately bring the case to conclusion and to, frankly, a remarkable settlement. So, I considered that. The basis for that settlement as well as the work that he did from ... May 1st of 2008 to its conclusion of September of 2009 as well as the work that was done on the firm's dime when he was there from October of 2003 until April of 2008.

After considering all these factors, the court found that PGA was entitled to a fee based on quantum meruit in the amount of 65% of the contingency fee paid to Mr. Gately and Mr. Brault.

Mr. Brault then asked the court to clarify its ruling with respect to appellants' argument that PGA had fee-split agreements with Mr. Gately and Mr. Brault. The court stated that it determined that Mr. Gately was not entitled to the 25%. With respect to Mr. Brault, it stated: "I considered all of the evidence presented including what the evidence was in terms of the fee to be paid to Mr. Brault. I have considered all of that in the percentage that I arrived at. It was absolutely in my calculations." The court stated that it made its findings "based on the credibility and looking at the case law and the evidence," and it "considered all of those factors."

Accordingly, the court entered judgment in favor of PGA, requiring appellants to pay PGA 65% of the 40% contingent fee earned in the Bargar case, as well as an additional $21,165.26 as reimbursement for expenses incurred by PGA in the Bargar case.

## STANDARD OF REVIEW

This Court recently set forth the standard of review of a court's ruling during a bench trial:

An appellate court reviews a trial court's factual findings for clear error, and reviews the trial court's legal conclusions *de novo*. *See* Md. R. 8–131(c) (An appellate court "will

not set aside the judgment of [a] trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."); *Ramlall v. MobilePro Corp.*, 202 Md.App. 20 [30 A.3d 1003] (2011) ("The clearly erroneous standard does not apply to [a trial] court's legal conclusions, however, to which [an appellate court] accord[s] no deference and which [the appellate court] review[s] to determine whether [or not] they are legally correct."). The appellate court views the evidence in the light most favorable to the prevailing party, *City of Bowie v. MIE Props., Inc.*, 398 Md. 657, 676 [922 A.2d 509] (2007), and resolves all evidentiary conflicts in the prevailing party's favor. *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md.App. 97, 107 n. 1 [838 A.2d 404] (2003), *cert. denied*, 380 Md. 619 [846 A.2d 402] (2004).

*Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md.App. 403, 451, 56 A.3d 631, cert. denied, 430 Md. 645, 62 A.3d 731 (2012).

## DISCUSSION

The Court of Appeals has discussed, on several occasions, the fees to which a discharged lawyer is entitled after termination of a contingency contract when the termination occurred prior to the occurrence of the contingency, i.e., the client's recovery of money. In *Skeens v. Miller*, 331 Md. 331, 335, 628 A.2d 185 (1993), the Court observed that "the client's power to end the relationship is an implied term of the retainer contract," and therefore, "if the client terminates the representation, with or without cause, the client does not breach the retainer contract, and thus, the attorney is not entitled to recover on the [contingency] contract."

The Court subsequently made clear, however, that an attorney may be entitled to recover fees on a quantum meruit basis. In *Somuah v. Flachs*, 352 Md. 241, 721 A.2d 680 (1998), the Court of Appeals held:

[W]here a client has a good faith basis to terminate the attorney-client relationship but there is no serious misconduct warranting forfeiture of any fee, the attorney is enti-

tled to compensation based on the reasonable value of services rendered prior to discharge, considering as factors the reasonable value of the benefits the client obtained as a result of the services rendered prior to discharge and the nature and gravity of the cause that led to the attorney's discharge.

*Id.* at 258, 721 A.2d 680. The Court explained that, in allowing a discharged attorney to recover the reasonable value of services rendered prior to discharge, "the court 'preserve[s] the client's right to discharge his attorney without undue restriction, and yet acknowledge[s] the attorney's right to fair compensation for work performed.'" *Id.* at 263, 721 A.2d 680 (quoting *Fracasse v. Brent,* 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9, 14 (1972)).

Appellants acknowledge the Court's holdings in this regard. Nevertheless, they contend that the circuit court's order awarding quantum meruit fees to PGA was erroneous for several reasons.

First, they argue that PGA was not entitled to any fee because a lawyer who, without justification, terminates representation is not entitled to any fee, and PGA "unilaterally terminated the attorney-client relationship then existing" by "removing the only lawyers assigned to the Bargar case." They assert that, "by terminating the attorney-client relationship then existing, the Angelos firm abandoned its client and materially breached its agreed undertaking under the contingent fee agreement, thereby forfeiting any claim to recover compensation in *quantum meruit.*"

Second, appellants argue that, even assuming that it was the Bargars who discharged PGA, "*quantum meruit* recovery must be denied or reduced to the extent of the nature and gravity of the cause that led to the firm's discharge." They assert that the "indisputable fact" is that PGA "was the sole cause of its own discharge," in that it "forced the clients to choose between the attorneys who had represented them all along and the firm that had fired those attorneys, with no identification of their replacements." Appellants argue that

the court's failure to consider that issue, instead finding that "everything was done properly," was an abuse of discretion.

Third, appellants contend that, in allowing quantum meruit recovery "by a law firm directly against attorneys later retained by the clients, the trial court created a new cause of action." They assert that "a suit for *quantum meruit,* as recognized by the Court of Appeals, requires an implied attorney-client contract between the parties, and cannot be maintained against third parties." Thus, they argue, a quantum meruit cause of action by a discharged attorney can be maintained only against a former client, based on an implied-in-fact contract pursuant to which the attorney renders services for which he or she expects to be paid, the client expects to pay, and there is a meeting of the minds.

Fourth, and finally, appellants assert that, even if PGA was entitled to some fees, the court erred in refusing "to enforce the fee sharing agreements that [PGA] made with Gately and Brault." Specifically, they assert that Mr. Gately and Mr. Brault were each entitled to 25% of PGA's fee.

PGA disagrees with all these contentions. It argues that the circuit court's judgment should be affirmed, asserting that the court was not clearly erroneous in concluding that PGA was entitled to 65% of the contingency fee in the Bargar case as compensation in quantum meruit for the reasonable value of the services PGA provided to the Bargars. It contends that the law is clear "that an attorney is entitled to be compensated for the reasonable value of services provided prior to the time the attorney is discharged by the client," and that the circuit court was not clearly erroneous in finding that most of the contingency fee obtained "was attributable to work performed by PGA."

With respect to appellants' argument that the circuit court erred when it found no evidence of abandonment warranting a forfeiture of PGA's fee, PGA responds that there was ample evidence to support the court's finding that PGA did not terminate the attorney-client relationship, but rather, the Bargars made an election to discharge PGA because they pre-

ferred to be represented by appellants. PGA asserts that the decision was "not some tortured 'Hobson's choice' for the Bargars," but rather, it was an easy choice followed by a "seamless" transition.

PGA disputes appellants' argument that the court erred in failing to find that a downward adjustment of the percentage of the fee was required based on the "nature and gravity of the cause that led to the attorney's discharge." It notes that the court found that "everything was done properly" in terms of notifying the Bargars of the circumstances and the transfer from PGA to Mr. Gately and Mr. Brault was "seamless," arguing that those findings were supported by the evidence and not clearly erroneous.

PGA further disputes appellants' argument that the court created a new, unauthorized, cause of action in allowing a quantum meruit claim by a law firm directly against attorneys later retained by clients. It contends that the Court of Appeals has "specifically set forth the process for bringing such a claim [seeking quantum meruit attorney's fees], which PGA followed to the letter."

With respect to the contention that the court erred in failing to enforce fee-sharing agreements with Mr. Gately and Mr. Brault, PGA makes two arguments. First, it contends that the argument has been waived. In any event, it asserts, the argument is without merit.

## I.

### Quantum Meruit

We begin with appellant's contention that PGA unilaterally terminated the agreed upon representation and abandoned the Bargars, without justification, and therefore, PGA forfeited its right to any fees. To be sure, there are situations where a discharged attorney's compensation may be forfeited, including where an attorney, "without justification, terminates an agreed undertaking." *Attorney Grievance Comm'n v. Korotki*, 318 Md. 646, 669, 569 A.2d 1224 (1990). *See also*

*Somuah,* 352 Md. at 264, 721 A.2d 680 (*"quantum meruit* recovery may be inappropriate where an attorney engages in misconduct, prejudicial to the client, for which the attorney may be disciplined, or where recovery by the attorney would be contrary to public policy").

In this case, however, the circuit court made a factual finding that PGA did not abandon the Bargars. Instead, it found that PGA advised the Bargars of Mr. Gately's termination and offered to continue to represent the Bargars in their lawsuit. The Bargars, however, elected to continue with representation by Mr. Gately and Mr. Brault, the attorneys in whom the Bargars had "confidence" and "who had been successful in the past." The court's findings in this regard are supported by competent material evidence in the record, and the finding that there was no evidence to support a forfeiture by PGA of its fee is not clearly erroneous.

■ Appellant's next contention is that, even if there was not a forfeiture of all fees, the court erred in failing to deny or reduce PGA's recovery "to the extent of the nature and gravity of the cause that led to the firm's discharge." In that regard, appellants argue that the "indisputable fact" is that PGA "was the sole cause of its own discharge" in that it "forced the clients to choose between the attorneys who had represented them all along and the firm that had fired those attorneys, with no identification of their replacements."

In *Somuah,* 352 Md. at 264, 721 A.2d 680, the Court of Appeals stated: "Where an attorney has been discharged for cause but that cause does not justify forfeiture, some courts have reduced the *quantum meruit* recovery of the attorney by a percentage due to the 'nature and gravity of the cause leading to discharge.'" The Court quoted *Reynolds v. Polen,* 222 Mich.App. 20, 564 N.W.2d 467, 472 (1997), for the proposition that, "where an attorney bears substantial responsibility for his or her discharge[,] the court 'should deduct the costs of work that had to be duplicated or modified from the discharged counsel's quantum meruit recovery.'" *Somuah,* 352 Md. at 264, 721 A.2d 680.

Here, as PGA notes, the evidence supports the circuit court's finding that the transition was "seamless," and the record does not suggest that any work had to be duplicated. Under these circumstances, even if it can be said that PGA was the cause of its discharge, it still had the "right to fair compensation for services competently rendered prior to discharge." *Id.* at 265, 721 A.2d 680.

In assessing the amount of compensation to which PGA was entitled, the court determined that, based on the facts and circumstances, PGA was entitled to a recovery of 65% of the 40% contingency fee earned in the Bargar case. In other words, it determined that this was "the appropriate portion of the total fee generated by the recovery." *Id.* at 268, 721 A.2d 680. In reaching this determination, the court considered, *inter alia,* the expert testimony regarding the time and labor required, the novelty and complexity of the case, the length of the relationship with the client, and the experience of the lawyers involved. The court also considered the time Mr. Gately and Mr. Brault spent on the case after they were retained by the Bargars. The court observed that, following the Bargars' election to discharge PGA, the transfer of the case to Mr. Gately and Mr. Brault was seamless and caused no prejudice to the Bargars. Although, as discussed, *infra,* we disagree with the court's analysis regarding the applicability of any fee-sharing agreements, we find no error in the court's decision not to reduce any quantum meruit recovery by PGA due to the "nature and gravity of the cause that led to the attorney's discharge."

We turn next to appellants' contention that, "[b]y allowing *quantum meruit* recovery by a law firm directly against attorneys later retained by the clients, the trial court created a new cause of action unauthorized by" law. PGA disagrees, asserting that the Court of Appeals in *Somuah,* 352 Md. at 268 n. 8, 721 A.2d 680, "set forth the process for bringing such a claim, which PGA followed to the letter."

To be sure, appellants cite cases from other states holding that an attorney who initially represents a client, and subse-

quently is dismissed, can obtain quantum meruit recovery for work performed, but only against the client, not the successor attorney. *See King v. Lessinger,* 276 Ga.App. 145, 622 S.E.2d 381, 384 (2005); *Howard & Bowie, P.A. v. Cloutier & Briggs, PA,* 759 A.2d 707, 712 (Me.2000). In both of these cases, however, the courts made a point of noting that the cases involved situations where one counsel succeeded the other in working on the litigation, and the attorneys had not worked together on the case. *King,* 622 S.E.2d at 384–85; *Howard,* 759 A.2d at 711. Where the attorneys worked together on a case, the result was different, at least in Georgia. *See Kirschner & Venker, P.C. v. Taylor & Martino, P.C.,* 277 Ga.App. 512, 627 S.E.2d 112, 113 (2006) (attorney could recover in quantum meruit against former co-counsel, distinguishing *King,* 622 S.E.2d at 381, which "held that *former* counsel did not have a cause of action for fees against *subsequent* counsel," because attorneys were never co-counsel). Here, Mr. Gately and Mr. Brault worked together on the case on behalf of PGA.

Moreover, other jurisdictions hold that a discharged attorney may sue a successor attorney. *See, e.g., Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.,* 287 P.3d 842, 848–49 (Colo.2012) (en banc); *Carr v. Pearman,* 860 N.E.2d 863, 870 (Ind.Ct.App.2007); *Pryor v. Merten,* 127 N.C.App. 483, 490 S.E.2d 590, 592–93 (1997), *review denied,* 347 N.C. 578, 502 S.E.2d 597 (1998). The Maryland Court of Appeals has indicated agreement with these latter jurisdictions.

■ In *Somuah,* 352 Md. at 267, 721 A.2d 680, the Court of Appeals held that, in a contingency fee case where the client had a good faith basis to discharge the attorney, the discharged attorney's claim accrues upon the fulfillment of the contingency, i.e., when the client recovers damages. The Court explained that there may be an advantage in waiting to see if the contingency occurs: "If there is a large recovery that is in significant measure due to Respondent's efforts, a good argument can be made for basing the *quantum meruit* recovery on a percentage of the total fee." *Id.* at 268, 721

A.2d 680. The Court then explained the procedure for the discharged attorney to follow:

> If the discharged attorney sues to recover a percentage of the contingency fee, *the new attorney must be joined as a party* to the action because the discharged attorney's recovery will be derived *from the new attorney's share of the recovery*. This division will be based on the discharged attorney's contribution to the successful legal efforts prior to the discharge.

*Id.* at 268, n. 8, 721 A.2d 680 (emphasis added).[7]

■ Despite this plain language, appellants assert that, "by allowing *quantum meruit* recovery by a law firm directly against attorneys later retained by the clients," as opposed to allowing recovery solely against the clients, the parties who undertook the obligation to pay for the attorney's services, "the trial court created a new cause of action." According to appellants, because the *Somuah* language provides that an "attorney is entitled to compensation based on the *reasonable value of services* rendered prior to discharge," 352 Md. at 258, 721 A.2d 680 (emphasis added), and PGA sought a judgment in the circuit court for the "reasonable value of services and expenses they expended between October of 2003 and April, 2008," (emphasis added), it necessarily follows that PGA "proceeded below under an implied-in-fact contract theory of *quantum meruit*," which is untenable because there was no "meeting of the minds" between PGA and Mr. Gately and Mr. Brault.

■ Appellants are correct that an implied-in-fact contract exists when the conduct of the parties indicates a mutual intention to contract, a "meeting of the minds," and the

---

**7.** Where an attorney is discharged without any good faith basis, by contrast the attorney's course of action in quantum meruit accrues immediately upon the termination of the contingency agreement, and the attorney is not required to wait when the contingency is fulfilled. *Somuah v. Flachs*, 352 Md. 241, 267, 721 A.2d 680 (1998). There is no dispute here that the Bargars had a good faith basis to discharge PGA after it terminated Mr. Gately, the primary attorney who worked on their case.

services rendered indicate that the person rendering them expected to be paid and the recipient expected to pay. *Mogavero v. Silverstein,* 142 Md.App. 259, 277, 790 A.2d 43, *cert. denied,* 369 Md. 181, 798 A.2d 553 (2002). Appellants ignore, however, that quantum meruit recovery can be based, not only on contracts implied-in-fact, but also on contracts implied-in-law. *Id.* at 274 n. 2, 790 A.2d 43.

An implied-in-law contract is a quasi-contract that "implies a promise on the part of the defendant to pay a particular debt" and "requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense." *Id.* at 275, 790 A.2d 43. A quasi-contractual quantum meruit claim is identical to a charge of unjust enrichment. *Mohiuddin v. Doctors Billing & Mgmt. Solutions, Inc., et al.,* 196 Md.App. 439, 447, 9 A.3d 859 (2010), *recons. denied,* 196 Md.App. 439, 9 A.3d 859 (2011). The quasi-contract is

> not based on intention or consent of the parties, but is founded on considerations of justice and equity, and on [the] doctrine of unjust enrichment. It is not in fact a contract, but an obligation which the law creates in absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it.

*Slick v. Reinecker,* 154 Md.App. 312, 319, 839 A.2d 784 (2003) (quoting *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons,* 358 Md. 83, 94–95, 747 A.2d 600 (2000)).

In *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners,* 155 Md.App. 415, 843 A.2d 252 (2004), we explained that unjust enrichment is the "unifying principle" for all quantum meruit claims based upon a single factual situation, and that the remedy of restitution in the form of a money judgment is the "award made to vindicate that principle." *Id.* at 454, 843 A.2d 252 (emphasis omitted). With respect to the measure of recovery on a contract implied-in-fact versus recovery on a quasi-contract, we explained that,

although technically, recovery in an implied-in-fact contract, if an amount is unexpressed, is the reasonable market value of the plaintiff's services, and recovery in quasi-contract is in restitution, and thus is the amount of the defendant's unjust gain, the " 'reasonable market value of plaintiff's services can be viewed as the correct remedy in most quantum meruit cases, even in many cases in unjust enrichment because the reasonable value *can be viewed as the defendant's gain in certain situations.*' " *Id.* at 487, 843 A.2d 252 (quoting Candace S. Kovacic, *A Proposal to Simplify Quantum Meruit Litigation,* 35 Am. U.L.Rev. 547, 553 (1986)). In other words,

> [s]ometimes when the unjust enrichment of the defendant cannot otherwise be measured, the reasonable value of the services received, but not paid for, is the measure of the unjust gain. In the context of quasi-contract, however, the reasonable value of the services is viewed through the prism of the defendant's gain or enrichment rather than through the prism of the plaintiff's loss.

*Id.* at 486–87, 843 A.2d 252. Applying this law to the present case, the amount of damages, whether based on a implied-in-fact contract with the Bargars, or an implied-in-law contract with Mr. Gately and Mr. Brault, is based on the reasonable value of the services rendered.

Pursuant to *Somuah* 's directive, PGA appropriately waited for its cause of action to accrue, i.e., for the fulfillment of the contingency, the settlement of the case. It then pursued its claim for quantum meruit recovery by filing suit against the Bargars, as well as Mr. Gately and Mr. Brault, who held the contingent fee in escrow pending resolution of PGA's claim for a part of the fee. At the point in the proceedings when judgment was entered, Mr. Gately and Mr. Brault were in possession of the 40% contingent fee, and they were the parties from whom PGA's share of the recovery would be derived.[8] There was no error in the circuit court's order

---

8. Indeed, the record indicates that both PGA and appellants submitted proposed orders reflecting that the judgment should be paid by Mr. Brault and Mr. Gately and that the claims against the Bargars should

directing Mr. Gately and Mr. Brault to pay PGA the reasonable value of the services rendered by PGA prior to its discharge.

## II.

### Fee Sharing

Appellants' next argument involves their contention that PGA had fee-sharing agreements with Mr. Gately and Mr. Brault. They assert that the court "either forgot the evidence or otherwise neglected to deal with the issues," and they contend that the court erroneously "refuse[d] to enforce the fee sharing agreements."

PGA asserts that there "is no merit to [a]ppellants' argument that the trial court erroneously failed to enforce fee-sharing agreements which Messrs. Gately and Brault allegedly entered into with PGA." In support, it makes several assertions.

First, PGA contends that appellants waived this argument. This is so, they contend, because appellants "never asserted a counterclaim against PGA for breach of contract or raised an affirmative defense of setoff based on the existence of alleged agreements between them and PGA for a percentage of the fee."

Second, PGA argues that any contract-based claims "should be disregarded as a matter of law because the retention agreement upon which all counsel operated prior to April 19, 2008, was terminated and was no longer enforceable after the Bargars discharged PGA." In that regard, it states: "PGA received absolutely nothing under its retainer agreement with the Bargars. Appellants' contract claim is to a percentage of nothing."

---

be dismissed. Given this procedural posture, it would be untenable to reverse the circuit court's judgment on the ground that the judgment was against the attorneys, as opposed to the Bargars.

Third, on the merits, PGA asserts that the court properly weighed the credibility of the witnesses in concluding that there was no fee-split agreement between Mr. Gately and PGA. With respect to Mr. Brault's claim to a percentage of PGA's share, PGA notes that the court expressly stated that it had considered that claim in its calculations, awarding 35% of the Bargar fee to appellees.

## A.

### Proceedings Below

After the court rendered its oral opinion, Mr. Brault asked the court to "make a finding did [PGA] agree to 25 percent to Mr. Gately and did they agree to 20 percent to [Mr. Brault]." The court replied: "I am not going to give you a finding on that because I have considered all the evidence and I have factored that into my decision in terms of the 65 percent." The following colloquy ensued.

MR. BRAULT: Well, could you tell me how those factors because that to me amounts to 65—in other words, the numbers don't mix.

THE COURT: Yes, they do. The way I did my math and the way I came to my conclusion, I considered the work that you did and considered the evidence of what was testified to, and there was some dispute whether it was 20 or 25 percent, I considered that in coming—in the 65 percent. So, that was considered. The issue relating to the 25 percent that Mr. Gately testified to on top of—he felt he was owed to at the time because of that intake sheet, I frankly didn't feel was a factor in my ultimate conclusion. But I can tell you that I considered all of that in the number that I came up with.

MR. BRAULT: So, you decided he was not entitled to the 25 percent?

THE COURT: I found that at the time—well, I guess that's true. I found that he was not entitled to the 25 percent.

MR. BRAULT: Is there any evidence that contradicts that?

THE COURT: I found based on the credibility and looking at the case law and the evidence, and I considered all of

those factors as well as the others that I stated on the record in deciding that [PGA] was entitled to 65 percent of the already earned contingent fee. There was no additional fee owed by the Bargars. So, that's my ruling.

\*   \*   \*

MR. BRAULT: All I would like would be a finding as to where that evidence is.

THE COURT: Okay. I found it based on all the evidence testified to in this case, both the written and the testimony. I did not find—so, that's how I came up with my number. I can't be anymore—again, because this is not an hourly rate case . . . I looked at the work that was done and considered the testimony of the experts, I have considered the testimony of Mr. Gately and the written documents presented and determined that that is how the fees should be decided based on quantum meruit. That's how I did it. I can't be any more specific, I don't believe.

## B.

### Waiver

Initially, we are not persuaded by PGA's assertion that appellants waived their argument that they were entitled to credit for fee-splitting agreements because they did not assert a counterclaim or raise the defense of set-off. In Maryland, counterclaims are permissive and not compulsory. *Rowland v. Harrison,* 320 Md. 223, 233, 577 A.2d 51 (1990). *See* Md. Rule 2–331(a) (A "party *may* assert as a counterclaim any claim that party has against any opposing party, whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.") (emphasis added). Moreover, set-off is not an affirmative defense that must be set forth in an answer. *See* Md. Rule 2–323(g).

## C.

### Existence of Fee–Sharing Agreements

PGA's next assertion, however, that any contract-based claims "should be disregarded as a matter of law

because the retention agreement upon which all counsel operated prior to April 19, 2008, was terminated and was no longer enforceable after the Bargars discharged PGA" has more merit. At least one other court has agreed with the proposition that a separate fee-sharing agreement between counsel, which is predicated on a contingency fee agreement with a client, ceases to exist if the client terminates the contingency fee agreement.

In *Olsen v. Harbison,* 191 Cal.App.4th 325, 119 Cal.Rptr.3d 460 (2010), Christopher Olsen was retained by Kathleen Klawitter to represent her in a personal injury action. *Id.* at 328, 119 Cal.Rptr.3d 460. She signed a contingency fee retainer argument. *Id.* Mr. Olsen brought in Joseph Harbison to assist with the case, and the two attorneys reached an agreement regarding a division of attorneys' fees, which Ms. Klawitter authorized. *Id.* at 328–29, 119 Cal.Rptr.3d 460. Ms. Klawitter then fired Mr. Olsen and entered into a new fee agreement with Mr. Harbison, who ultimately settled the case. *Id.* at 329, 119 Cal.Rptr.3d 460.

Mr. Olsen sued Mr. Harbison to recover attorney fees, asserting claims for, *inter alia,* quantum meruit and breach of contract based on the agreement to divide attorneys' fees. *Id.* at 328, 119 Cal.Rptr.3d 460. With respect to the breach of contract claim, the Court stated:

Klawitter hired [Mr. Olsen] as her lawyer. The subsequent association of [Mr. Harbison] into the case was predicated on the retainer agreement between [Mr. Olsen] and Klawitter, and Klawitter authorized the fee-sharing agreement in which [Mr. Harbison] was to receive "a portion of the total attorney fees recovered." . . .

[O]nce Klawitter fired [Mr. Olsen] as her attorney, the contract between them ceased to exist. When the Klawitter-[Olsen] contract ceased to exist, the fee-sharing agreement between [Mr. Olsen] and [Mr. Harbison], premised on that agreement, also ceased to exist. "There was no viable

contract on which to base a breach of contract claim against [Mr. Harbison]."

*Id.* at 341, 119 Cal.Rptr.3d 460.

■ We agree with this analysis. We hold that, when a client discharges his or her lawyer, any contingency fee contract ceases to exist, and generally, absent contractual language to the contrary, any fee-splitting agreement predicated on the initial contingency fee contract also ceases to exist.

We thus turn to the agreements in this case. Initially, with respect to Mr. Gately, the circuit court found that a fee-splitting agreement did not exist between Mr. Gately and PGA. This finding was not clearly erroneous. *See* Md. Rule 8-131(c). The court had conflicting evidence before it, specifically Mr. Gately's testimony that there was a fee-splitting agreement, and Mr. Raschke's testimony that Mr. Smouse had rejected any such agreement and that the arrangement "had never been . . . seriously considered." It was within the court's province to weigh that evidence, judge the credibility of the witnesses, and to conclude, as it did, that no such agreement existed.

■ With respect to Mr. Brault, however, the court appeared to find that a fee-sharing agreement existed, although no specific findings were made in that regard. And the evidence presented regarding a split-fee agreement was sparse, with the terms of any such agreement being far from clear.

In its Second Amended Complaint for *Quantum Meruit,* PGA acknowledged that, "[a]t Gately's request, Brault was retained as co-counsel for the Bargars, and PGA agreed to pay Brault a portion of any contingency fee PGA received in the case under the terms of the Retainer." Appellants acknowledged in their brief on appeal, however, that Mr. Brault "never got anything in writing" from PGA with regard to a fee-splitting agreement.[9] During its opening statement, counsel for PGA stated that "Mr. Angelos agreed to have Mr.

---

9. Rule 1.5(e)(2) of the Maryland Lawyers' Rules of Professional Conduct provides that a division of fee between lawyers who are not in the

Brault join in the case," although it noted that there was "some dispute as to ... the fee arrangement." Counsel for PGA asserted that the agreement was that Mr. Brault would receive 20% of the fee, but he argued that any fee-splitting arrangement was "immaterial because [PGA's] ... agreement with the Bargars was terminated." Mr. Gately testified that Mr. Brault never had a conversation with either Mr. Angelos or Mr. Smouse about his fee. The only actual evidence presented regarding Mr. Brault's fee was that, in April 2008, during the time when Mr. Gately was discharged from PGA, Mr. Smouse told Mr. Gately that Mr. Angelos had agreed that Mr. Brault was entitled to 25% of the fee earned in the Bargar case. Based on the foregoing, it is clear that some sort of fee-sharing was anticipated, but the details of this arrangement, including whether the fee was 20% or 25%, are not clear.

Under these circumstances, we will apply the general rule that the termination of a contingency fee agreement terminates a fee-sharing agreement predicated on it. Because PGA is not entitled to a contingency fee, there is no contingency fee for Mr. Brault to share. Accordingly, to the extent the circuit court factored in the fee-sharing agreement, the circuit court's ruling must be vacated and remanded for further proceedings.

We stress that our decision in this case does not mean that Mr. Brault is not entitled to compensation for his work while the contingency agreement was in effect. Like PGA, however, his claim would be for the reasonable value of his services. On remand, the circuit court should factor that into the analysis in determining the award to which PGA is entitled.[10]

---

same firm may be made only if the client agrees to the joint representation and the agreement is confirmed in writing. Clearly there was no writing here. The Court of Appeals has held, however, that the Rule does not render invalid or unenforceable otherwise valid fee-sharing agreements because of "rule violations that are merely technical, incidental, or insubstantial or when it would be manifestly unfair and inequitable not to enforce the agreement." *Post v. Bregman*, 349 Md. 142, 168, 707 A.2d 806 (1998).

10. Our holding is not meant to suggest that the award on remand should be less than 65%; it could be more than that, less than that, or

JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANTS.

the same, depending upon how the judge weighs the various factors on remand.